Costas AIVALIOTIS, Libelant,

v.

S.S. ATLANTIC GLORY, her boats, etc., in rem, and Ocean Cargo Line, Ltd., and Maritime Brokers, Inc., in personam, Respondents.

No. 8011.

United States District Court
E. D. Virginia,
Norfolk Division.

Feb. 21, 1963.

1953) (Frank, J., dissenting), rev'd, 347 U.S. 556, 74 S.Ct. 716, 93 L.Ed. 948 (1954).

Sidney H. Kelsey, Peter K. Babalas, Norfolk, Va., for libelant.

Vandeventer, Black, Meredith & Martin, Norfolk, Va. (Charles F. Tucker, Norfolk, Va.), for respondent.

WALTER E. HOFFMAN, Chief Judge.

For his serious and permanent injuries resulting in the amputation of his right leg, libelant has instituted this action against the SS ATLANTIC GLORY, a vessel flying the flag of the Republic of Liberia, *in rem*, and the vessel's owner, Ocean Cargo Line, Ltd., of Monrovia, Liberia, *in personam*. The respondent Maritime Brokers, Inc. is a New York corporation serving as broker and agent for the vessel but the evidence does not support any claim as to this respondent and no further reference will be made to this phase of the case. The evidence leads to the conclusion that the ultimate control of the owner, Ocean Cargo Line, Ltd., is vested in citizens of Greece, although the vessel never visits either Liberia or Greece. The Livanos interests constitute the controlling factor.

By an employment contract dated January 2, 1959, in Greece, the Greek Maritime Company of Limited Liability, acting as agent for the ATLANTIC GLORY, employed libelant, then 19 years of age, as a deck boy on the Liberian vessel, ATLANTIC GLORY. The details of this agreement are not pertinent [1]

1. A portion of the employment contract refers to provisions of the Greek Collective Agreement. In addition, the agreement provides: "It is agreed upon

**570**

as the libelant was then sent to Rotterdam, Holland, where he signed articles aboard the vessel on January 10, 1959. The Liberian articles make no reference to Greek law and, to the extent that they may be applicable, state:

> "It is agreed that the duties, rights, remedies, liabilities and obligations of the shipowner and Master on the one hand and the seaman and crew on the other hand arising out of and pursuant to this agreement and to the employment provided for herein, shall be governed fully and exclusively, by the Laws and Regulations, then by the General Maritime Law relating thereto, and the parties to this agreement hereby consent to be governed thereby exclusively."

At the outset the respondents urge that the determination of this case must be in accordance with the Greek law as the ultimate control of the vessel is in Greek interests. They seek to invoke the "flag of convenience" rule to their benefit. They effectively point to the opinion of Chief Judge Sobeloff in Southern Cross S. S. Co. v. Firipis, 4 Cir., 285 F.2d 651, 84 A.L.R.2d 895, cert. den. 365 U.S. 869, 81 S.Ct. 903, 5 L.Ed.2d 859, wherein the dicta leads to the conclusion that Greek law could be applied in a case involving a Honduran flag vessel (285 F.2d 651, 654). The same issue was before this court in Perdikouris v. the S/S Olympos, D.C., 196 F.Supp. 849, and after discussing the intent of the "flag of convenience" rule, it is said:

> "To permit the shipowner to avoid the consequences of his 'flag of convenience' by resorting to the laws of the country where the ultimate con-

trol rests would do violence to the legal system. It would create a haphazard situation whereby there would be no controlling law. The language of Judge Sobeloff as heretofore quoted is admittedly suggestive that the law of the country where the ultimate control rests should govern. There is a strong intimation to the contrary in Kontos v. S. S. Sophie C., D.C.E.D.Pa., 184 F.Supp. 835, 837, affirmed per curiam, 3 Cir., 288 F.2d 437."

■ There is nothing in the able briefs of proctors which point to any reason for modification of the views expressed by this court in Perdikouris. A great quantity of the evidence presented at the trial of the present controversy relates to interpretations of Greek law. Respondents contend that libelant's remedy is limited to the provisions of Law 551 of the Kingdom of Greece, a law which may be likened to compensation statutes in the United States. As this court is firmly of the opinion that Liberian law controls [2] it is unnecessary to belabor the point. As was said in Perdikouris:

> "We conclude, therefore, that an aggrieved party may, at his election, look to the law of the flag, and that parties creating the illusory flag cannot insist upon the application of the law of the country where the ultimate control and ownership rests. This is properly one of the burdens imposed upon those who, for reasons of their own, seek an illusory flag and a corporate entity which is wholly unrelated to the country of ultimate control and ownership."

that all differences between the present contributing parties arising out of the work performed will be governed by the Greek Law and it will be solved exclusively by the Greek Courts under whose jurisdiction the contributing parties submit themselves by the present." The agreement, if it purports to vest jurisdiction solely in a Greek court for an injury of this nature is unenforceable. Blanco v. Phoenix Compania de Navegacion, S. A., 4 Cir., 304 F.2d 13.

**2.** The Code of Liberia, Title 22, Sec. 310, provides for the employment contract between the seaman and the ship. Title 22, Sec. 30, states that, in the absence of any conflict with Liberian statutes, the non-statutory general maritime law of the United States is adopted as the general maritime law of the Republic of Liberia.

In the leading case of Lauritzen v. Larsen, 345 U.S. 571, 73 S.Ct. 921, 97 L.Ed. 1254, Mr. Justice Jackson said:

"Perhaps the most venerable and universal rule of maritime law relevant to our problem is that which gives cardinal importance to the law of the flag."

██ It seems clear that something more than "substantial contacts" must be shown before the law of the forum will disregard the law of the flag and thereby invoke the law of the nation where "substantial financial contacts" are maintained. This is not a case where the law of the forum (United States) is also the place of "substantial contacts" (Greece). The Jones Act is not applicable. We look merely to the law of the Republic of Liberia.

The accident which is the subject matter of this litigation occurred on January 19, 1959, while the vessel was en route from Rotterdam, Holland, to the Port of Hampton Roads. The vessel docked approximately 30 hours later. There is no merit to libelant's claim for failure to treat; nor is the contention that respondents failed to pay earned wages when due worthy of discussion.

Libelant, under orders from the bosun to assist in removing excess water from the No. 3 'tween deck hatch, fell into the square of the hatch and was propelled to the lower hold. The open portion of the 'tween deck hatch was 28' 9" in length, 23' in width, with a coaming 8½" in height surrounding the square of the hatch. The entire 'tween deck area is approximately 75' in length, 63' 6" in width and 10' 3" from the 'tween deck flooring to the weather deck. Directly aft of the hatch opening are the port and starboard deep tanks. Approximately 4½' is the distance between the after end of the open hatch and the forward end of the deep tanks. Three trimming hatches [3] were located on either side of the hatch area, the closest being approximately 8½' from the after end of the open hatch. Along each side of the open hatch coaming are four thick welded pads, about ¾" in height, affixed to the deck flooring and extending away from the hatch coaming approximately one foot. Vent trunks were located on each side of the after end of the open hatch, about opposite the passageway separating the open hatch and deep tanks, at a distance of 6 to 7 feet away from the corners of the open hatch and deep tanks. Excluding for the moment the lighting conditions, water and remnants of coal, this is what confronted libelant when he entered the 'tween deck area to commence his work.

It is uncontradicted that an excessive quantity of water had accumulated in the No. 3 'tween deck, especially in the after portion in the vicinity of the deep tanks. There are conflicting versions as to how the water entered this area. The master contends—although he has no knowledge of the fact—that rain water came into the hatch while the vessel was discharging its cargo of coal at Rotterdam. The bosun expresses the view that the water leaked out through the top of the deep tanks, the ship being in ballast and having been subjected to heavy weather prior to January 19. Whatever the cause, the excess water was present and all concede that it had to be removed in preparation for loading coal at Hampton Roads. The only pumps available were in the lower tanks and, for this reason, it became necessary to remove the water by filling five-gallon buckets, carrying them to a ladder in the forward part of the 'tween deck hatch, hoisting them to the mast house on the weather deck and then dumping the water overboard.

At 8:00 A.M. on the morning of January 19 the bosun, Boulas, ordered three deck boys, Moudros, Mandalaros and libelant, to remove the accumulated water from the No. 3 'tween deck hatch. The bosun issued no specific instructions. He gave no warning whatsoever. He did tell

3. The record does not disclose whether the trimming hatches were open or closed. Presumably they were closed.

them to set up two lights in the hatch area; one being a cluster light with four bulbs, the other being a single light. Moudros placed the single light approximately two feet to the port side of the ladder leading from the No. 3 'tween deck hatch to the mast house and close to the top of the ladder. The electrical connection for this single light was apparently to a plug in the mast house. As indicated, this ladder was at the forward end of the 'tween deck area. The cluster light was located by Moudros on or near a ladder situated between the after end of the area separating the port and starboard deep tanks, a short distance from the extreme after end of the hatch area. On a direct line between the forward ladder where the single light was placed and the after ladder where the cluster light was located, the distance measures approximately 64 feet, thus leaving about 11 feet from the cluster light to the aft end of the hatch. Of course, it was impossible for anyone to walk a direct line from the forward ladder to the cluster light due to the open square of the hatch. The path necessitated a course around the open square on the port side.

Libelant was initially assigned the duty of remaining in the mast house, hauling the buckets by rope from the 'tween deck and then dumping the contents overboard. He would thereafter return the buckets to Moudros or Mandalaros, whichever deck boy had assumed the duty of carrying the buckets from the deep tank area to the forward ladder, the other deck boy being occupied in filling the buckets with shovels provided for that purpose. At approximately 10:00 A.M. or a little thereafter, the two deck boys in the 'tween deck had completed removing water from the area around the port deep tank and transferred their operations to the area aft and starboard of the starboard deep tank. The men took a coffee break and came up on deck. When they resumed their duties, libelant

was directed to change places with Moudros. Libelant then entered the 'tween deck for the first time, there being credible evidence to the effect that he had never previously been below deck on a similar vessel [4]. As the hatch was covered over and closed topside, the only available lighting was that provided by the single light and cluster light, although presumably some slight ray of light may have existed near the top of the forward ladder leading to the mast house. Mandalaros had already descended the ladder and had reached the area near the starboard deep tank when libelant started to enter the hatch. When libelant reached the deck he stated that he felt water slushing around his shoes and a muddy substance under his feet. This is understandable as water from buckets being raised to the weather deck was probably concentrated in this area; however, the court finds that otherwise the principal portion of the 'tween deck remaining to be cleaned up by reason of excessive water was in the vicinity of the starboard deep tank. This is not a suggestion that the entire 'tween deck was free from remnants of coal or mud, as the evidence supports the contention that this coal-carrying vessel was only cleaned by the longshoremen following discharge operations, that particles of coal of varying sizes remained on the 'tween deck, that the crew members were seldom called upon to sweep out the 'tween deck and, in addition, it is reasonable to assume that a certain quantity of mud had collected in the 'tween deck due to the rolling of the vessel on the day of the accident and prior thereto, and the trackage of mud by Moudros and Mandalaros for a period of two hours prior to the time libelant entered the hatch. Libelant contends that upon reaching the deck he waited for a few moments in an effort to accustom his eyes to the darkness and then called to Mandalaros who instructed him to come

4. Libelant's prior experience at sea was limited to small Caiques sailing Greek waters and one tour of duty on a larger vessel similar to what we know as an

LST where vehicles were rolled into the vessel, apparently not fitted with hatches such as are on dry cargo vessels.

over to the starboard deep tank area. Mandalaros denies having said anything to libelant prior to the accident but we think this is an immaterial point as libelant may have called out to his co-worker and erroneously assumed that he replied. In any event, libelant was walking in the general direction where Mandalaros was working when he fell into the open square of the hatch. The testimony supports the finding that libelant had proceeded along the port side of the open square of the hatch to a point approximately 6 to 7 feet from the port corner aft of said square, when his foot struck some impediment and he catapulted into the lower hold. Whether libelant stumbled or slipped over one or more particles of coal, or over the welded pad affixed to the deck flooring [5] is relatively unimportant. Obviously libelant had not been warned as to the existence of any impediments. It is conceded that there were no stanchions with lifelines around the hatch opening. While the marine expert called by the respondents testified that it was not customary to place hatch boards across the open 'tween deck hatches in coal-carrying vessels of this type and, further, it was unnecessary to erect stanchions with lifelines around the hatch opening, he acknowledged that stanchions and ropes should be so erected when men were assigned to work in close proximity to the square of the hatch and, further, that reasonable safety required (1) adequate lighting, (2) a warning to the seamen, and (3) the presence of an able bodied seaman to supervise the work of ordinary seamen. The three workers in this particular 'tween deck were deck boys with experience akin to apprentice seamen in the United States, i. e., they were somewhat less qualified than ordinary seamen.

When a survey was conducted by the shipowner on January 21, 1959—two days following the accident—the hatch was open from the weather deck and particles of coal were found scattered over the 'tween deck of the No. 3 hatch.

The 'tween deck lighting conditions are in sharp dispute. To accept libelant's statement would require a finding that the only light was located in the after deck area and that this was a single bulb. This may well have been what appeared to the libelant at the time but is contrary to the weight of the evidence. Both Moudros and Mandalaros [6] testified that the lights were sufficient for them to do their work safely but on cross examination of Moudros, the following appears:

"Q. You mean that the 'tween decks on this ship with the two lights you had was actually darker than the average bar that you would go into.

"A. The hold is darker.

"Q. The 'tween deck is darker.

"A. That is right."

Taking cognizance of the fact that the average seaman is a frequent visitor to many "bars"—to say nothing of judicial experience on the subject—the conclusion is inescapable that the area was far from safe, especially to one who was not forewarned of the impending danger and possible impediments. To accept respondents' argument that the entire area was adequately lighted for working conditions

---

5. A description of the size and location of the welded pads affixed to the deck flooring has been previously noted.

6. Mandalaros, after testifying that he could see the single light on the forward ladder, stated:

"Q. Could you also see the ladder forward?

"A. Perhaps.

"Q. Could you see everything forward, not only the lights, but could you see the forward bulkhead and the ladder and everything there, or could you just see the little light alone?

"A. As far as the light around I could see; beyond that was shadow and I couldn't see.

"Q. Could you see the forward ladder where the little light was hanging?

"A. The light wasn't hanging on the * * *.

"Q. Well, no, it was near it. I just want to know whether you could see the ladder?

"A. I don't remember seeing the ladder, but I saw the light there."

compels a finding that libelant practically intended to commit suicide. Assuming arguendo that the lighting was sufficient to reveal the open hatch, the impediments heretofore noted still existed and libelant had no reason to believe that welded pads, approximately ¾″ in height, were located about one foot from the 8½″ hatch coaming. It is urged that libelant had a pathway about 20′ in width between the open square of the hatch and the extreme port side of the No. 3 'tween deck, but considering the presence of the trimming hatches and vent trunk this distance is quickly reduced to about six feet. It is logical to assume that any seaman intending to turn left into the passageway separating the port deep tank and the open square would be inclined to remain close to the 8½″ hatch coaming.

Likewise we are confronted with a sharp conflict as to weather conditions on the morning of the accident. Libelant, complaining of seasickness, has perhaps magnified the true conditions. The log book reflects that the wind was from the northwest at Force 3. With the exception of the bosun who testified that the sea was calm, the preponderance of the evidence points to the fact that the vessel was rolling moderately—enough to cause a person to lose his balance, but not sufficient to conclude that the ship was rolling and pitching violently.

▆ It is true, of course, that a vessel in ballast is not *per se* unseaworthy merely because her 'tween deck hatches are left open. Nor can it be said under all circumstances that stanchions and lifelines must be provided. It depends upon the conditions then prevailing. When, however, inexperienced men are sent to the danger area without warning and required to work under lighting conditions described as "darker than the average bar" with pieces of coal and welded pads in the general area which are in the vicinity where the seaman is normally expected to walk and no stanchions with lifelines are erected to protect the square of the hatch, it compels findings of unseaworthiness of the vessel and negligence on the part of the bosun.

The evidence is clear and convincing. The order to libelant, under the circumstances here presented, was improvident.

▆ Respondents urge that, even though liability be found, libelant's damages must be reduced by reason of his contributory negligence. It is a fundamental principle of admiralty law that a seaman does not assume the risk of unseaworthiness or negligence on the part of a fellow member of the crew. A seaman may assume an inherent and unavoidable risk which does not arise out of negligence or unseaworthiness, but such is not this case. What could this 19 year old deck boy do under the circumstances? There were no fixed or stationary lights in the 'tween deck. If he refused to obey the order of the bosun, he would undoubtedly be in trouble although, in all probability, he would still have his leg. He was unaware of the inadequate lighting until he reached the bottom of the ladder. He knew that Moudros and Mandalaros had been working in the area for at least two hours and had a right to assume that the working conditions were reasonably safe. He had no duty to inquire as to possible obstructions or impediments which might make his path of travel unsafe. Viewing the evidence as a whole, the court is not of the opinion that libelant was guilty of contributory negligence.

Respondents rely upon Ross v. Steamship Zeeland, 4 Cir., 240 F.2d 820, but in that case the watchman knew, or should have known, as to the location of the pile of wire cable in the No. 1 hold— a situation which differs from that confronting the libelant who, assuming that he should have known of the open portion of the hatch, rather obviously was not chargeable with knowledge of any impediments in his path of travel. Carrying two empty buckets in the direction where Mandalaros was working was a part of his duty in the performance of his work. That this fact rendered him less capable of saving himself in the event of a fall is immaterial. Finding that libelant is free of contributory negli-

gence, we turn to the question of damages.

As may be expected, libelant was in great pain following his fall. He fractured his left leg; he sustained a compound fracture of the right ankle and knew at the time that the bone had broken the skin; he had multiple contusions over his entire body. A stretcher was brought below and libelant was hoisted to the 'tween deck. From this point he was carried up the ladder and taken to quarters adjoining the vessel's master's quarters. He remained in constant pain until a doctor administered morphine upon arrival of the ship in the waters of Hampton Roads, following which he was taken to the United States Public Health Service Hospital. At the hospital an attempt was made to manipulate the bones into position. Morphine was administered every four hours for approximately two weeks, after which a shift was made to codeine. His right leg was placed in a long cast.

His first operation was on the day of his arrival, same consisting of what has been heretofore described. On June 29, 1959, he again went for another major operation in an attempt to effect a fusion of the right ankle joint. Again a cast was placed on the leg. Thereafter an infection set in at the site of the operation. On September 18, 1959, a third operation took place; the wound was opened, the bone edges scraped, and the sinus tract was packed. Dressings were required for some period thereafter. On May 5, 1960, the right leg was amputated just below the knee. In the interim period the fracture of the left leg had completely healed. In total, at the United States Public Health Service Hospital, libelant underwent two major and five minor operations, the latter consisting of scraping the bones, packing, etc.

During the nearly 16 months following the accident until the amputation of the leg, libelant was in pain which could be relieved only by drugs. To a limited extent he built up a tolerance to these drugs and the relief became less effective. During all of this time his right leg remained in a cast. It was, of course, a difficult medical problem to keep him from becoming addicted to narcotics but, fortunately, this was avoided.

On September 7, 1960, subsequent to his release from the United States Public Health Service Hospital, libelant, who was then under the care of private expert orthopaedic surgeons, underwent a fourth operation which consisted of a revision of the amputation stump. Following the amputation of his limb in May, 1960, he was still taking narcotics for pain and, for the first time, encountered "phantom limb" pain—a statement that is corroborated by Drs. Taylor and Vann, the attending private orthopaedic surgeons —but this mental condition has improved and there is no apparent permanency as to this phase of his injury.

From the time of the injury libelant has had considerable trouble with his right knee due to the involvement of the cartilage and bone. The knee condition was primarily due to an old injury, but was aggravated by the fall. Cortisone injections tended to minimize this difficulty and, following another surgical operation hereinafter mentioned, the pain has lessened. It is still possible that the loose bodies may have to be removed from the knee but this is unlikely and, at the most, would result in a temporary disability not exceeding six weeks. There has, of course, been appreciable atrophy of the right thigh occasioned by disuse of the limb.

Libelant was fitted for a prosthesis which, for some months, was painful. As late as the fall of 1962 libelant had not reached maximum cure. He underwent his fifth operation on October 2, 1962, which consisted of a partial denervation of the knee joint and stump by sectioning the common peroneal and the posterial tibial nerves [7]. As a result of an exami-

7. Information relative to the operation of October 2, 1962, was submitted in the form of a letter from Dr. Gervas S. Taylor to Charles F. Tucker (one of proctors for respondents) dated November 19, 1962. Proctors for libelant and

nation on November 6, 1962, Dr. Taylor reports:

"At this time I feel that he has recovered from the surgery which was performed on him on October 2, 1962. His stump is comfortable. He wears his prosthesis well and even the pain in the knee, which was from chondromalacia of the patella, is less. This, of course, is due to partial denervation of the knee joint and stump, by sectioning the common peroneal and the posterior tibial nerves.

"I feel that this patient has now reached his maximum improvement and he may now be discharged. I do not feel that he is fit for work as a seaman aboard a ship, but I do feel that he is fit for sedentary or light work, or work that does not involve climbing ladders, lifting, or stooping. I think the long term results of this young man will prove that he now has obtained a satisfactory mental and physical health, in spite of loss of part of the right lower extremity."

Thus we bring to a close the unfortunate chapter in libelant's life from the standpoint of his physical disability, pain and suffering. He will, of course, remain under a state of permanent-partial disability until he answers a higher call.

The evidence points to a replacement of the prosthesis at a cost of $500.00 at intervals of from two to five years, dependent upon the use and care of the artificial limb. More specifically, certain features of the prosthesis must be replaced—after six months as to the sock; two years for the leather straps, lacings and cuff; five years as to the joints. Since libelant has now apparently reached the point of maximum cure, the respondents are not liable for replacements of the prosthesis in future years. This

is a proper item to consider in the overall damage award.

When injured, libelant was receiving 15 English pounds per month. He has an actual loss of earnings covering a period of three years and 10 months. To what extent he would have advanced as a seaman during that extended period of time is, of course, problematical. Computing his average monthly wage at $60.00, he would have sustained a wage loss aggregating $2760.00. We think that this computation is reasonable and conservative under the circumstances.

Libelant's misfortune has, in some respects, afforded him an opportunity to improve his station in life. During his extended period of hospitalization he met, became engaged to, and thereafter married an American citizen of Greek origin. It is his intention to become an American citizen. He has gradually learned to speak the English language. His education is limited to $2\frac{1}{2}$ years of high school. Nevertheless, his overall prospects of making a higher wage in the United States are definitely better than they would be in Greece. The court cannot find that he probably will, in fact, sustain any actual loss of future earnings by reason of his impairment when his previous station in life is considered. However that may be, one of the measures of his damage is based upon his *earning capacity* and not merely the amount actually earned. Morris v. Cartwright, 57 N.M. 328, 258 P.2d 719; 15 Am. Jur., Damages, p. 501, sec. 91. Tested by these principles, there can be little doubt as to the impairment of his *earning capacity*. His days of performing heavy labor are at an end; he must determine to educate himself and rely upon the so-called "white collar" type of employment.

In Blanco v. Phoenix Compania de Navegacion, SA., 4 Cir., 304 F.2d 13, the

respondents were fully advised. No request for further hearing has been received and the court assumes that the factual statements and conclusions as related by Dr. Taylor may be considered on the question of damages. The main pur-

port of the letter was to fix the date at which libelant arrived at the point of maximum improvement. The court is advised that maintenance and cure has been paid to and including November 19, 1962, but no express finding is made.

appellate court approved an award by this court in the sum of $75,000.00 (plus an additional sum for loss of earnings, expenses, etc.) for the high amputation of a leg following an accident aboard ship which necessitated an immediate amputation. True, the libelant now before the court is more readily able to carry the prosthesis because of the location of the amputation and, to this extent, he is more fortunate than Blanco. On the other hand, the extended period of pain and suffering has been far greater in libelant's case. To attempt to draw comparisons with other decided cases would be futile. It must depend upon the application of various standards and the exercise of sound judgment by the court. In Blanco the seaman was 37 years of age. The present libelant was 19 at the time of the accident and is now 23. According to the Commissioner's 1958 Standard Ordinary Table libelant had a life expectancy of 51.28 years at age 19 and 47.64 years at age 23.

Taking into consideration the many elements of damage which must be weighed in an effort to reasonably compensate libelant for his pain, suffering, mental anguish, embarrassment, actual loss of wages to the point of attaining maximum improvement, impairment of future earning capacity, the expense of maintenance and replacement of the prosthesis *in futuro*, and considering his life expectancy, discounted to the present value of one dollar where appropriate, the court is of the opinion that libelant is entitled to a decree *in rem* against the vessel and *in personam* against the owner, Ocean Cargo Line, Ltd., in the sum of $115,000.00. The decree will be entered on the assumption that maintenance and cure has been paid to the date of maximum improvement and that the parties do not desire to take further evidence as to the nature of the operation performed on October 2, 1962. A privately contracted dental bill in the sum of $619.00 is disallowed as no opportunity was afforded the respondents to have libelant examined and treated at the United States Public Health Service Hospital, although proctor for libelant did telephone proctor for respondent to advise that libelant was going to the dentist on the day of his initial treatment but no offer was made of his willingness to go to the Marine Hospital. Calmar S. S. Corp. v. Taylor, 303 U.S. 525, 531, 58 S.Ct. 651, 82 L.Ed. 993.

Adopting this memorandum in lieu of specific findings of fact and conclusions of law, pursuant to Admiralty Rule 46½, proctors for libelant will prepare and present, after opportunity for inspection and endorsement by proctors for respondents, an appropriate decree for entry.