## Richmond

EXXON CORPORATION

v.

ROBERT C. FULGHAM, JR.

September 9, 1982.

Record No. 800321.

Present: Carrico, C.J., Cochran, Poff, Compton, Thompson, and Stephenson, JJ., and Harrison, Retired Justice.

*Robert M. Rolfe (Robert F. Brooks: Thomas F. Farrell, II; Hunton & Williams, on brief), for appellant.*

*Walter H. Emroch (William B. Kilduff; Walter H. Emroch & Associates, on brief), for appellee.*

HARRISON, R.J., delivered the opinion of the Court.

Robert C. Fulgham, Jr., recovered a judgment for $150,000 against Exxon Corporation for personal injuries he sustained in an automobile accident that occurred on July 6, 1977, as a result of the alleged negligence of an Exxon employee. We granted Exxon an appeal limited to a review of the action of the trial court in instructing the jury that it could award damages for any lessening of Fulgham's future earning capacity, and for admitting certain testimony on this issue. We also consider the action of the court in admitting evidence of the plaintiff's life expectancy.

On July 6, 1977, Fulgham, a twenty-six-year-old man, married, with one child, was involved in a multi-vehicle accident. He testified that his car was stopped in a line of traffic with his hands positioned on the steering wheel and that as a result of the impact his left hand was bent backward. He said that after the accident his knee was bleeding, and on the following morning "my neck was real sore, my back was sore, my left wrist was throbbing."

Fulgham was first treated at the Medical College of Virginia Hospital and later at Richmond Memorial Hospital, where X-rays were taken. He was advised to see a specialist. Dr. Virgil Robert May, an orthopedic surgeon, testified that the plaintiff suffered multiple injuries to his back, lower back, right knee, left wrist, and neck region. The most severe injury was that to his left wrist.

In 1971, Fulgham fractured the navicular bone in his left wrist while playing football. In the area of the fracture, May found "considerable arthritis," which he attributed to that accident. He also found that the bone broken in 1971 had never united. May said that plaintiff reinjured this wrist in the July 1977 accident. He described the injury as "a fracture of the scaphoid bone or the navicular bone in his left wrist," and that, while there had never

been a bony union following the 1971 accident, "a ossification across the fibrous tissue of the fracture" had occurred. He described the occurrence as the growth of fibrous tissue between the ends of the bones to hold the bones together or, stated differently, that Fulgham "had healed with that tissue rather than for it to ossify or calcify across it as most bones do." He said that in Fulgham's case soft tissue had grown between the bones, which "is the way nature has of healing" in certain instances, and that in the July 1977 accident, the fibrous tissue between the non-union of the bone in Fulgham's left wrist was "disrupted." He immobilized the wrist to prevent pain that he said would otherwise occur if the ends of the bones or nerve endings rubbed together around the fracture.

May testified that at the end of a five-week period Fulgham still complained of pain and had limited motion of the wrist. The doctor then decided upon a surgical procedure and did a bone graft across the bones that had disrupted the fibrous tissue. The graft was accomplished by taking a little piece of bone from Fulgham's radius bone and fitting it into and across the non-union, "hoping" the bone would grow together. Following the operation, plaintiff wore arm casts for approximately six months.

In summarizing the result of the operation, May testified that plaintiff was getting along satisfactorily considering his status before the operation, but that he still had a stiffness in his wrist and would always have a limitation of motion in that wrist "regardless of really what is done." In his opinion, Fulgham has "approximately a 50 percent loss of use of his wrist and hand as a result of the accident and the operation."

Dr. May testified that there are certain "alternatives" that might be done to relieve pain but if done would result in further weakness of the wrist and limitation of motion. The doctor did not feel that another bone graft was indicated. The one he did was not successful. In April 1979, Dr. May was of opinion that Fulgham would probably "in the future have to have the wrist fusion or certainly a prosthesis placed in his wrist to replace his grafted navicular to give him some semblance of motion without pain." May recommended "an arthrodesis of the wrist," feeling that this would eliminate the pain, but he added that it would also eliminate the motion, particularly in flexion and extension. He wrote that Fulgham would "be restricted in his working ability because of restriction of motion in his wrist if this is done." The operation

would require hospitalization of at least two weeks and surgical costs of at least $1,000 in addition to follow-up care.

As a result of the July 1977 accident, Fulgham, who was employed by Mauck and Company, was unable to work from July 7, 1977, to July 22, 1977. He was hospitalized for the bone graft operation from October 11, 1977, through October 28, 1977. He lost five weeks from work, or $807.70, and his medical expenses totaled $2,281.95. Prior to working for Mauck and Company, Fulgham had been employed by the American Furniture and Fixture Company. He was enrolled in its apprenticeship program and was training to become a cabinetmaker. He worked for this company from August 1973, until March 1976, at which time he left to accept the job with Mauck at a higher salary.

Fulgham testified at length regarding the injuries he sustained in the July 1977 accident, the pain he suffered, and the medical treatment he received, including the bone graft operation. He said that prior to the July 1977 accident he was able to use his left wrist and participate in athletics and work. He testified that the injury had altered his activities in that he could no longer play golf, lift weights, play drums, do push-ups, ride a motorcycle, or pursue his hobby of woodworking. He said "my wrist just won't bend back," and that his injury had affected his ability to work in his job as an office-machine repairman. He said the pain in his wrist "can come on for no reason" and that when a change of weather occurs the wrist starts to ache and becomes stiff; that he worked on office machines and had "to fit inside the machines"; and that "I can't turn my wrist or turn in the position I need to get to it. I may strain it during a working day. I notice this causes a lot of pain too."

Prior to the accident involved here, plaintiff was engaged in doing woodwork and building pieces of furniture, some for sale. He said that he is now unable to do this type of work for any length of time because his hand starts "to cramp up. It gets so tight I can't straighten my fingers out. I have to stop working." He said it now takes him twice as long to do woodworking jobs as it took "before the Exxon wreck." Fulgham introduced in evidence several certificates of merit and achievement for outstanding performance in woodworking. He said that he had hoped to go into the woodworking business for himself but that this was now impossible because of his wrist injury.

Exxon assigns error to the action of the trial court in including in its instruction on damages a paragraph which told the jury, *inter alia,* that in assessing damages to which Fulgham was entitled, it could take into consideration "any lessening of earning capacity he may reasonably be expected to sustain in the future," if the jury believed from the evidence such lessening resulted from the collision. Exxon argues that there was no evidence of a lessening of earning capacity. It points to the fact that at the time of the accident Fulgham was earning $700 per month as an office-machine repairman and that by the time of trial his earnings had increased to $1,000 per month as the result of several salary increases. It says that sixteen months prior to the accident Fulgham had quit a cabinetmaking apprenticeship at American Furniture and Fixture Company at a time when he was only a year and a half short of becoming a certified cabinetmaker, and that Fulgham abandoned this skilled trade in order to accept a higher paying job with Mauck.

We agree with appellant that the rule is well-settled in Virginia that no instruction may be given the jury unless supported by evidence at trial. *Oak Knolls Realty* v. *Thomas,* 212 Va. 396, 184 S.E.2d 809 (1971); *Beasley* v. *Bosschermuller,* 206 Va. 360, 143 S.E.2d 881 (1965). The dispositive issue in this case is whether the evidence supported a lessening of earning capacity instruction. In *State Farm Ins. Co.* v. *Futrell,* 209 Va. 266, 163 S.E.2d 181 (1968), the plaintiff suffered a 25% permanent impairment of his left leg as a result of an injury. In holding that an instruction on a loss of earning capacity was proper, we said:

> State Farm objects to so much of the instruction given the plaintiff on damages as concerns his loss or lessening of earning capacity. The record shows that Futrell was either in the hospital, or recuperating from his injuries, and away from his job, for several months as a direct result of the accident, and that he sustained a 25% disability of his left leg. The evidence is sufficient for the jury to have found that by reason of these injuries the plaintiff had lost a portion of his earning capacity, and that he will sustain a further loss or lessening of earning capacity in the future.

*Id.,* at 271, 163 S.E.2d at 185.

It is not material that plaintiff was earning more at the time of trial than he was in July 1977, when injured. The plaintiff sought compensation for loss of earning capacity rather than actual loss of earnings. The Court, in *Aivaliotis* v. *Steamship Atlantic Glory,* 214 F. Supp. 568 (E.D. Va. 1963), comments on the difference. In that case, the plaintiff's accident was a fortuitous one in that it afforded him an opportunity to improve his station in life, become an American citizen, learn the English language, and obtain work at a higher wage. However, the court held that although it could not find that Aivaliotis would probably sustain any loss of future earnings by reason of his impairment when his previous station in life is considered, nevertheless, "one of the measures of his damage is based upon his earning capacity and not merely the amount actually earned. [Citations omitted.] Tested by these principles, there can be little doubt as to the impairment of his earning capacity." 214 F.Supp. at 576.

Although Fulgham had previously suffered a comminuted fracture and displacement of his left navicular, which had never united, the injury had healed as the result of the growth of fibrous tissue between the ends of the bones, and Fulgham had recovered to the extent that the 1971 injury apparently no longer impaired his working ability or recreational activities. It was this fibrous tissue that was disrupted when Fulgham's wrist was injured in the 1977 accident. It was that accident which necessitated the extensive medical treatment undergone by Fulgham, the bone graft operation, and the pain and discomfort by reason thereof. The unchallenged medical testimony of Dr. May is that Fulgham will always have a limitation of motion in the wrist regardless of future operations thereon. In the opinion of this specialist, the plaintiff sustained an approximate 50% loss of use of his wrist and hand as a result of the accident and the operation. He said this includes the loss of motion, pain on using the hand and wrist, as well as the arm. Fulgham testified that his wrist pains him from time to time, and that his ability to perform his work, or engage in recreational activities, has been diminished and limited because of its condition. This evidence by the plaintiff and his physician was sufficient for the jury to have found that by reason of the injury to his left wrist, the plaintiff has sustained a lessening of earning capacity in the future.

The plaintiff is a man of limited education and earns his livelihood by physical effort and manual labor, specifically by the use

of his arms and hands. At the time of trial, he was an office-machine repairman. Although not a certified cabinetmaker, plaintiff is adept and skilled in the area of woodworking. There is credible evidence from which the jury could have concluded that because of his background, education, skills, and the work he performs, the type and character of the injury sustained by plaintiff to his left wrist is such as will lessen his earning capacity and could diminish his opportunity to secure employment in the future.

Appellant complains that Fulgham made no effort to segregate the effects of three separate accidents which he sustained to his left wrist: the football injury in 1971, the Exxon accident in 1977, and a third injury at work on March 2, 1979, while lifting an office machine. Dr. May described the last injury as a "hyperextension" injury. He did not think the navicular bone had been refractured but "as a precaution" placed plaintiff's wrist in a cast which he wore for about a month. The nature, extent, and effect of plaintiff's injuries were issues to be determined by the trier of the facts. The jury was instructed that the burden was upon the plaintiff to prove by a preponderance of the evidence the damages he claimed and that such damages were properly attributable to the accident. It was further told that if it believed that a particular injury complained of by the plaintiff might have resulted from either of two causes, for one of which the defendant might have been responsible and for the other of which it was not, and if it was unable to determine which of the two causes occasioned the injury complained of, the plaintiff could not recover. In addition, the jury was told that if at the time of the accident plaintiff was suffering from a preexisting disability, which condition may have been made more severe by any injuries he may have received in the 1977 accident, or more aggravated, he was entitled to recover for such additional aggravation resulting from the accident, but not for any preexisting disability.

We find no error in the action of the trial court in permitting the jury to consider any lessening of plaintiff's future earning capacity or his expectation of life in determining damages, if any, to which he was entitled. We have disapproved an instruction on loss of earning capacity in cases where the plaintiff's injury, although permanent, was either minimal, cosmetically objectionable only, or would not be an impediment or hinderance to the injured party in the performance of work for which he was qualified to perform by education, training, and experience. *Basham* v. *Pate,*

212 Va. 772, 188 S.E.2d 198 (1972); *Oak Knolls Realty* v. *Thomas, supra; Beasley* v. *Bosschermuller, supra.* There being evidence that the injury to Fulgham was not only permanent in nature, but was of a type and character from which the jury could have reasonably inferred the plaintiff would suffer a lessening of his earning capacity, it was proper for the court to have permitted evidence of plaintiff's life expectancy. Code § 8.01-419.

Exxon's objection to testimony given by David M. Roberson, Superintendent of American Furniture and Fixture Company during the time Fulgham was employed by that company, has merit. Roberson testified that Fulgham's ability was "very, very good" and that had he completed his apprenticeship he would have been a qualified cabinetmaker and certified in cabinetmaking, earning somewhere between $12,000 and $13,000 a year. Roberson was then permitted, over objection of the defendant, to respond to the question: "[A]ssuming that it would take Mr. Fulgham twice as long to do the work that he used to do while working for American Furniture and Fixture, would you hire him today if he applied for a job?" Roberson answered, "No, sir, I couldn't."

The question was improper and one to which any witness probably would have responded as did Roberson. Evidence of Fulgham's skill in the area of woodworking prior to the 1977 injury was properly admitted for it was relevant to a consideration of the effect of the injured wrist on plaintiff's earning capacity. However, it was improper for plaintiff to have explored with American's superintendent Fulgham's availability or desirability as an employee of that company, or the salary range of a "top qualified cabinetmaker," which Fulgham was not and never intended to become. Roberson's testimony improperly focused the attention of the jury on the financial rewards allegedly reaped by certified cabinetmakers, an occupation that was abandoned by the plaintiff and a role he was not qualified to fill. Had Fulgham been a third-year medical student who quit medical school because of an attractive outside job he got from Mauck, it is obvious that the dean of the school would not be permitted to testify that some top graduates of his medical school made over $200,000 a year. However, we think the admission of Roberson's evidence was harmless. Assuming a qualified cabinetmaker does make $12,000 to $13,000 a year, this evidence could not have influenced the jury or had an adverse effect on the size of the verdict because it was testified

that Fulgham's salary as an office-machine repairman at Mauck was already within that range.

The judgment of the trial court is

*Affirmed.*