JOHN CLARK, ET AL.

V.

DOROTHY ANN CHAPMAN

Record No. 881017

November 10, 1989

Present: Carrico, C.J., Compton, Stephenson, Russell, Thomas,* Whiting, and Lacy, JJ.

---

\*  Justice Thomas prepared and the Court adopted the opinion in this case prior to the effective date of his resignation, November 1, 1989.

656

*Marianne Nelms Macon (Frank B. Miller, III; Sands, Anderson, Marks & Miller*, on briefs), for appellants.

*James E. Sheffield (Rodney E. Williams*, on brief), for appellee.

Justice Thomas delivered the opinion of the Court.

Dorothy Ann Chapman sued John Clark and his employer Winn-Dixie Raleigh, Inc. (hereinafter collectively referred to as Clark) for personal injuries allegedly sustained when Clark, who worked at a grocery store, pushed a loaded produce cart into Chapman's hand, crushing her hand. The case was tried to a jury which returned a $290,000 verdict in favor of Chapman. Clark appeals, contending, among other things, that the trial court should have declared a mistrial because of statements made by Chapman during her testimony; that the jury should not have been allowed to consider evidence concerning lost earnings, lost future earnings, and lost earning capacity; that the verdict was excessive as a matter of law; and that the jury should have been instructed on contributory negligence.

On Monday, April 7, 1986, about 9:00 a.m., Chapman was shopping in a Winn-Dixie grocery store in Henrico County. She was standing in an eleven-foot-wide aisle next to the meat display case. Her grocery cart was parallel to and its right side was touching the rail of the display case. The front end of her grocery cart was pointed directly towards two swinging doors, twenty-seven feet in front of the cart, which led from the produce storage room. Chapman stood with her left hand hanging over the left side of her grocery cart near the handle. As she faced the meat counter, her left side was pointed towards the two swinging doors.

While standing as described and looking at the items in the display case, Chapman heard a loud crash, looked around to her left, and saw a "big cart" coming through the swinging doors. The cart was loaded with produce, covered with plastic, and was being pushed from behind. The cart was six feet tall, two and a half feet wide, weighed 200 pounds in its loaded condition, and was known at the store as a "redi-rack."

Chapman returned her attention to the display case. To her back and to the left of her grocery cart was open aisle space of approximately nine feet. However, Clark, who was pushing the redi-rack, did not see Chapman and pushed the redi-rack into her left hand, which was still hanging over the side of the grocery cart.

Chapman could not move her arm or her hand. Clark kept pushing the redi-rack. Chapman tried to scream "but nothing would come out." She finally yelled "stop." Her hand was numb. She went into the meat department where someone let her put her hand in ice. The manager looked at her hand and noted that it was already swelling up. Chapman felt dizzy and in pain. She could not remove her rings.

She was taken to the Laburnum Medical Center. Dr. William F. Moore, who saw her that morning, testified that she was in "significant" pain with "significant" swelling of her hand. She had a decreased range of motion due to pain and swelling. And she exhibited tenderness of the palmar side of her forearm. To prevent the rings on her left hand from acting as a tourniquet, they were removed with a metal cutter. The doctor diagnosed "a wrist and forearm sprain, and contusion of the small ring and long fingers." He described her injury as a soft-tissue injury involving the nerves and muscles of the hand. Chapman was given pain medicine, her hand was wrapped in an ace bandage, and she was advised to use ice packs. That night, Chapman could not sleep because of the pain.

She returned to the medical center the next day. At that time, the swelling from her hand extended above her wrist. She complained of increased pain; she exhibited significant hand tenderness; and her blood pressure was elevated. Her pain medication was increased. Later that day she fainted and was brought back to the medical facility. The doctors concluded that she was suffering from anxiety along with the pain; additional medicine was prescribed.

Three days after the accident, Chapman fainted again. She fell and hit her head on a coffee table. She was admitted to Richmond Memorial Hospital by Dr. Richard Mercer. Her "hand and joints were quite inflamed." Chapman was given hot water soaks and hot wax treatments for her hand as well as an anti-inflammatory drug. She was also given medicine for anxiety. When she left the hospital her dizziness and fainting had ceased. She felt a little calmer and her heart was not racing. However, she continued to have numbness, swelling, and pain in her hand.

In May 1986, Dr. Mercer referred Chapman to Dr. Robert Adelaar, an orthopedic surgeon specializing in injuries to the hand. Dr. Adelaar saw Chapman on May 21, 1986. His examination showed increased swelling of the left hand compared to the

right hand; tenderness in the palm of the left hand and up to the forearm; and a grip strength of zero. With regard to grip strength, Dr. Adelaar explained that Chapman could pick up a pack of cigarettes but probably would have trouble picking up a telephone receiver. She had a relatively normal range of motion in her hands.

Dr. Adelaar saw Chapman from May 1986 through September 1986, attempting various treatments during that time period. By the end of August, Chapman could move her hand and do light housekeeping. Nevertheless, Chapman testified that she remained in pain and that it was getting worse but that she used her hand because she had been told by her doctor to do so. In September 1986, Dr. Adelaar advised Chapman that, in his opinion, she had improved as much as she would and that she would have to learn to live with her pain. He advised her to go to work.

In the middle of September 1986, Chapman was hired at a Holiday Inn in Richmond to work in the laundry room engaged in such activities as folding sheets and towels, giving the maids supplies, and loading and unloading washers. She held this job for six weeks but the pain in her hand got worse each day. She stopped work on October 29, 1986, because of pain.

After she left the Holiday Inn job, Chapman returned to Dr. Adelaar in early November 1986. He was of opinion that her hand and forearm continued to be sensitive to pressure. He saw her on an irregular basis in November 1986; September, November, and December 1987; and January 1988. Dr. Adelaar's final diagnosis was that Chapman suffered from sympathetic dystrophy. He explained that this is a condition in which the nerves controlling constriction and dilation of the blood vessels in, and thus the blood flow to, the hands do not regulate properly. Those nerves "have abnormal responses to the point of swelling with increased sweating." Those nerves "have problems in compensating their extremity to adapt it to normal surroundings." Dr. Adelaar opined that Chapman has "a permanent disability or permanent dysfunction of her arm or thirty percent use of that arm." He explained further that the nature of Chapman's problem is that:

she cannot actively move her wrist, elbow, hand, fingers through a normal range of motion in the course of everyday activities. Yes, she can move in those areas given enough

time and if she is not having too much pain, but she cannot use those as we would use it.

A clinical psychologist testified that Chapman was seriously depressed and that she suffered from a serious chronic pain syndrome. Another clinical psychologist testified that as long as she suffered from physical pain she would continue to have emotional pain. He said he would not expect Chapman's pain to diminish "all that much" even with counseling.

## I

We consider first whether the trial court should have granted a mistrial. During Chapman's direct testimony, the following exchanges occurred:

Q. Did you consult with Dr. Adelaar again after finishing the hand management therapy he recommended?

A. Yes, I did.

Q. Was there any discussion about a job?

A. Yes. He knew I was looking for a job before the accident, and *I told him that I needed money desperately.*

(Emphasis added.) Defense counsel immediately requested the trial court to instruct the jury to disregard the italicized comment. The trial court so instructed the jury. The exchange continued:

Q. What problems, if any, did you encounter during that five or six weeks that you were in the laundry room at the Holiday Inn?

A. There was a lot of pain each day, and the pain kept getting worse. I was told by the doctor to keep using my hand. *I needed the money,* so I just kept going as long as I could.

(Emphasis added.) Defense counsel then moved for a mistrial. The trial court listened to argument outside the presence of the jury. The court refused to grant a mistrial but offered to advise the jury to disregard the italicized remark, an offer which defense counsel declined.

■ The grant or denial of a mistrial falls within the sound discretion of the trial court. *State Farm Ins. Co.* v. *Futrell*, 209 Va. 266, 274, 163 S.E.2d 181, 187 (1968). A mistrial should not be granted for minor irregularities and mistakes in a trial which can be cured by a direction from the trial court to disregard the irregularity or mistake. *Carter* v. *Shoemaker*, 214 Va. 16, 17, 197 S.E.2d 181, 182 (1973). A mistrial is not appropriate unless "there is a manifest probability that objectionable evidence or statements before the jury are prejudicial to the adverse party." *Id.*, 197 S.E.2d at 183.

Clark argues that Chapman's statements that she needed money inflamed passion in, and prejudiced, the jury. According to Clark, this is demonstrated by the fact that during closing arguments one juror asked, "what amount does she want?" Clark argues further that the size of the verdict also helps demonstrate that the jury acted on the basis of passion or with prejudice.

In both instances, Chapman was responding to questions about working. Read in context, her remarks can be taken as an explanation for her working despite her injury. She does not appear to have been attempting to make a plea to the jury for money. The trial court observed Chapman and the jury's reaction to her answers. The trial court was persuaded that an instruction to disregard the remarks would be sufficient. We are not persuaded, on this record, that Chapman's responses created a manifest probability of prejudice to Clark. Therefore, we hold that the trial court did not abuse its discretion in denying the motion for mistrial.

## II

The bulk of Clark's attention both on brief and in oral argument was directed towards the question of damages. He contends, in that regard, that the testimony of a rehabilitation counselor concerning Chapman's employability, the testimony of an economist concerning Chapman's lost wages and lost future wages, and the portion of the jury instruction on damages which concerned lost wages and lost future wages all should have been kept from consideration by the jury. All three of these items are interrelated. The language of the challenged portion of the instruction provides a pertinent backdrop to the overall discussion; it reads, in relevant part, as follows:

If you find your verdict for the plaintiff, then in determining damages to which she is entitled, you may consider any of the following which you believe by the greater weight of the evidence was caused by the negligence of the defendant:

. . .

(5) Any earnings she lost because she was unable to work at her calling.

(6) Any loss of earnings and lessening of earning capacity, or either, that she may reasonably be expected to sustain in the future.

## A

Chapman qualified Sharon Bungar, a clinical psychologist, as an expert in the area of rehabilitation counseling. Clark did not object.

Bungar explained that she works with people who have emotional or physical disabilities that can limit them in their everyday activities or in their ability to work. Her approach is to gather a full range of information on a patient including medical records, hospital records, physician's notes, lab reports, and the like. She then interviews and tests the patient so that she can establish a plan that will help maximize the patient's ability to work in a fashion that the patient can "physically and emotionally handle." In reaching a judgment about a patient's capabilities, Bungar testified that she relies on both the background information and on her own "behavioral observation on what a person is able and not able to do."

In Chapman's case, Bungar determined, among other things, that Chapman was born in August 1945; that she had an 11th grade education; and that she had worked as a waitress, a cashier, a stock room worker in a market, and as a laundry room worker. Based on this information, Bungar determined that Chapman's transferable work skills consisted of understanding simple instructions; learning simple procedures and techniques; performing routine repetitive work; using math to figure the cost of things; operating a cash register; talking to people to determine their needs; and dealing with the public with tact and courtesy.

Bungar was asked her opinion concerning Chapman's employability. She answered in two parts, part one concerning the

impact of Chapman's physical condition and part two concerning the impact of her emotional condition.

With respect to Chapman's physical ability to work, Bungar testified that she consulted the "Dictionary of Occupational Filings" which lists more than 12,000 jobs that a person can perform. She identified, on the basis of Chapman's transferable skills, 503 of those jobs that, in her opinion, Chapman could have performed prior to her accident. However, based on Chapman's post-accident condition, Bungar was of opinion that, from a physical standpoint, there were only "63 jobs that could be appropriate for her."

Next, Bungar factored in Chapman's emotional condition. Bungar explained that there are behavioral and emotional components to working. These include such factors as being able to do things, getting ready to go to work, providing transportation to and from work, communicating and interacting with co-workers and supervisors, concentrating on work duties, getting work done satisfactorily, and adapting to changing demands on the job. Bungar gave the following opinion: "based on the diagnosis of chronic-pain syndrome related to the reflex sympathetic dystrophy and the severe depression, I do not feel that she is capable of competing for a job and maintaining a job at this time." Bungar reiterated that, from a purely physical standpoint, her opinion is that Chapman has suffered an 87% loss of access to the labor market but that from a combined physical and emotional standpoint the loss of access is 100%.

Bungar also testified concerning her recommendations for a program to rehabilitate Chapman. She recommended individual counseling to help Chapman come to grips with the loss of the functions of her hand; chronic pain counseling to help Chapman manage her pain; career counseling to help Chapman decide what potential jobs she ought to pursue; and job placement assistance in locating an appropriate job. Bungar was of the view that her recommendations, if followed, would get "Chapman into a position where she could be competitive in the job market." Bungar testified that the rehabilitation program she outlined would take about three months.

Clark argues that Bungar's testimony should have been excluded because it was beyond her expertise and because it was not based on medical testimony that Chapman could not work. There was extensive *voir dire*, even in the midst of Bungar's testimony,

concerning her qualification to give an expert opinion concerning employability. The trial court ruled that she was so qualified and Clark has not pointed to anything in the record to cause us to question the trial court's determination. Moreover, in *Todt* v. *Shaw*, 223 Va. 123, 126-27, 286 S.E.2d 211, 213 (1982), we held that medical testimony is not necessary in order to allow a jury to consider lost future income. It follows, then, that such testimony was not necessary as a predicate for Bungar's opinion. The trial court did not err in admitting Bungar's testimony.

### B

Chapman qualified Robert W. Cook, Jr., as an economist. Cook calculated Chapman's lost income from the time she left her job at the Holiday Inn through the date of trial. He also calculated Chapman's lost future income.

·Regarding lost pre-trial income, Cook relied on the evidence that Chapman had secured a job at a Holiday Inn in Henrico in September 1986 and voluntarily left that job on October 29, 1986, because of the pain she was suffering. He simply multiplied the number of days Chapman would have worked times the minimum wage and arrived at a lost income figure of $11,246.00 which covered the one and three-quarter years which had elapsed between leaving the job and the date of trial. He then subtracted $730.00, an amount which he testified she had earned since she left work in October 1986, leaving a total of $10,516.

Clark argues that Cook's testimony concerning Chapman's lost pre-trial income should have been excluded because her work history was so sketchy and incomplete as to make any calculation of lost income mere speculation. According to Clark, Chapman's employment history suggests that she would have left the Holiday Inn job even if she had not been injured. We reject Clark's argument which amounts to nothing more than his view of the evidence. Chapman testified that she would not have left the Holiday Inn job except for her injury. Even if her employment history suggests otherwise, it was for the jury to decide. The trial court did not err in permitting Cook to testify concerning Chapman's lost pre-trial income.

Regarding lost future income, Cook testified that he considered reports submitted to him by three of Chapman's health care providers as well as information provided by Bungar. Further, he interviewed Chapman.

Cook determined that Chapman was 41 years old with a life expectancy of an additional 38.7 years and a remaining work life expectancy of a little over 11 years. He considered her work history prior to the accident and what work she had done following the accident. He assumed that Chapman would work at the minimum wage of $3.35 per hour for 40 hours per week ($134) for approximately 11.3 years, the rest of her work-life expectancy. He explained that he reduced the $134 per week by 3.6%, reflecting the difference between the average annual wage increase of 4.7% and the discount rate of 8.3%. That reduction lowered the weekly rate of pay for Cook's calculations to $130 per week.

Cook then made a further reduction to take into account Bungar's testimony concerning Chapman's lost access to the labor market. He testified as follows:

> Now, I had to reduce it a little more . . . because I was told she was not 100 percent unable to find a job. There were like 13 jobs out of a 100 she might be able to find. So 87 jobs out of 100 she can't go to work for 87 percent of opportunity, 87 percent of this amount of money is really all she'd be due. I took the $130 a week and dropped it down by 13 percent. . . . So that's what we're talking about, $112 a week in losses from here until she goes out to age . . . 54, or stops work.
>
> . . .
>
> So I made a calculation of future earnings in just the way I described it, and it came out to $44,710.

Cook testified that in making his calculations he gave Chapman the opportunity to hold 13 out of 100 jobs. He stated explicitly that his calculations were not based on its being totally impossible for Chapman to find work.

██ On brief, Clark argues that Cook's testimony should have been excluded because it was based on assumptions that had no basis in fact. We disagree. Cook took the jury step by step through his calculations, informing the jury at each stage of the data on which he relied. Upon consideration of the record, in light of the items on which Cook stated his calculations were based, it is plain to us that there was sufficient evidence to support the expert testimony. The trial court did not err in admitting Cook's testimony concerning Chapman's lost future earnings.

## C

Clark makes a separate argument that the portions of the damages instruction concerning lost wages and lost future wages should not have been granted. He contends that there was insufficient evidence to support those portions of the instruction. His argument in this regard is similar, in many ways, to his argument to exclude Bungar's and Cook's testimony. Thus, in large measure, the fact that Bungar and Cook's testimony was admissible leads to the conclusion that the challenged portions of the instruction were proper.

■ However, in addition to his contentions that Chapman's work history was too sketchy and that no physician testified that she would be incapable of working again for the rest of her life, Clark makes a further argument why the challenged portions of the instruction should not have been granted. Clark submits that the instructions should not have been granted because the economist failed to take into account the rehabilitation expert's testimony that Chapman could return to work with the benefit of a four-step counseling program. Clark argues that the economist's use of the 87% figure related only to the question of Chapman's condition at the time of trial, but had nothing whatever to do with what her condition might be after rehabilitation counseling.

This last argument is being advanced for the first time on appeal. Clark moved to exclude Cook's testimony prior to Cook's taking the stand. The basis of the motion was

> that in light of this lady's prior work history of 16 months total, that to ask this witness what this lady would have done in the future is pure speculation, and that it is pure error to allow this witness to testify in this regard, and we move this witness' testimony be excluded.

That motion was denied. When the instructions on damages were being argued, Clark objected to items (5) and (6) for the following reasons:

> consistent with my objection to the economist testifying again because of the very limited track record of the plaintiff in her work, I would object to this jury being allowed to consider any evidence relating to loss of earnings or loss of earning capacity in the past or in the future, sir, especially when

the lady voluntarily terminated her employment after this accident.

That was the extent of Clark's objection to the challenged portions of the damages instruction. The argument advanced here thus cannot be considered. Rule 5:25.

In our opinion, Chapman's evidence was sufficient to support the challenged portions of the damages instruction. The testimony from Bungar and Cook was admissible. Chapman's orthopedic surgeon testified that she suffered a 30% permanent disability in the use of her left arm. Chapman testified to chronic pain and depression. This was enough to allow the jury to consider lost future earnings and/or lost earning capacity. *See, e.g., Exxon Corp. v. Fulgham*, 224 Va. 235, 243, 294 S.E.2d 894, 897-98 (1982) (injured party with 50% permanent disability entitled to jury instruction on lost earning capacity despite increase in salary by time of trial); *State Farm Ins. Co.*, 209 Va. at 271, 163 S.E.2d at 185 (1968) (25% permanent disability of plaintiff's leg sufficient to support instruction on lessened earning capacity).

## III

■ Clark contends that a contributory negligence instruction should have been granted. According to Clark, the evidence which supports such an instruction came from Chapman's own mouth. Clark points out that Chapman testified that she heard a loud crash, looked up, saw the redi-rack then returned her attention to the meat display. Further, according to Clark, Chapman was aware of a display table in the middle of the floor ten feet behind her which would require the redi-rack to turn to one side of that table or the other. Clark argues that, at the least, Chapman had a duty to use her senses and faculties to avoid danger by paying attention to the redi-rack after hearing it "bang" through the doors.

Chapman was a business invitee. She had the duty to be aware of open and obvious dangers. *Tazewell Supply Company v. Turner*, 213 Va. 93, 189 S.E.2d 347 (1972). As defense counsel admitted during oral argument, "a shopper does not reasonably expect to be hit by a large cart in a grocery store." There was no evidence that Chapman heard the redi-rack coming towards her; she said she did not hear it. The emergence of a produce cart twenty-seven feet away from Chapman did not pose an open and

obvious danger to her. She had a right to return to her shopping without guarding herself against being struck by the redi-rack. The trial court did not err in refusing to grant the contributory negligence instruction.

## IV

Finally, we reject Clark's argument that the verdict was excessive as a matter of law. The gravamen of that argument is that of a total of $63,475.89 in special damages, $55,226.00 consisted of damages based on Cook's testimony which Clark claimed was speculative and should have been excluded. Thus, Clark argues, the special damages should have been no more than approximately $8,200 and special damages of that amount could not support a verdict of $290,000.

We have already decided that the lost income component of the special damages was properly before the jury. Thus, Clark's major premise fails. Beyond that, given Chapman's evidence concerning extreme and continuing pain, this verdict does not shock the conscience of the Court. Nor does anything in the record indicate that it was the product of passion, prejudice, or a misunderstanding on the part of the jury.

## V

For all the foregoing reasons, the judgment of the trial court will be

*Affirmed.*

Justice Russell, with whom Chief Justice Carrico joins, dissenting.

In *Cassady* v. *Martin*, 220 Va. 1093, 1100, 266 S.E.2d 104, 108 (1980), we held that it was reversible error to admit the expert testimony of an economist to establish a plaintiff's wage loss and loss of earning capacity, where the plaintiff had no established "track record" of employment prior to the accident. Because of the lack of factual foundation, we held that the expert opinion was "too speculative." *Id.*

I think the present case is similar. The record shows that this 41-year-old plaintiff's lifetime work history was so sparse and intermittent as to form an insufficient foundation for the admission of the economist's testimony. Consequently, the economist was

permitted to extrapolate that minimal work history into a lifetime wage loss using an elaborate construction of smoke and mirrors. Because I think it was error to admit that speculative testimony, I would reverse.