## 𝔖taunton

WILLIAM F. BEASLEY, ET AL. v. HERMAN M. BOSSCHERMULLER.

September 10, 1965.

Record No. 5981.

Present, Eggleston, C. J., and Buchanan, Snead, I'Anson, Carrico and Gordon, JJ.

*William L. Ward*, for the plaintiffs in error.

*Philip L. Russo* (*Russo, White & Katherman*, on brief), for the defendant in error.

Snead, J., delivered the opinion of the court.

On February 11, 1964, Herman M. Bosschermuller, plaintiff, instituted an action at law against Elliot H. Creekmore and William F. Beasley, defendants, to recover damages in the sum of $100,000 resulting from personal injuries he sustained when the automobile he was operating collided with a truck driven by defendant Creekmore while in the employment of defendant Beasley. Defendants' motions to strike plaintiff's evidence and to enter summary judgment in their favor made at the conclusion of plaintiff's evidence and at the conclusion of all the evidence were overruled.

The jury returned a verdict for plaintiff in the amount of $45,000 against both defendants. Whereupon, defendants moved the court to set aside the verdict as being contrary to the law and the evidence and to enter summary judgment for them or, in the alternative, to grant them a new trial. The motion was overruled and judgment was entered on the verdict. We granted defendants a writ of error.

Since the case is before us upon a jury's verdict which has been approved by the trial court the evidence will be stated in the light most favorable to plaintiff, the prevailing party. *Smith* v. *Spradlin*, 204 Va. 509, 510, 132 S.E. 2d 455.

The collision occurred on July 2, 1963, at about 3:00 p.m. on Route No. 13 in the city of Chesapeake. The weather was clear, the road was dry and the speed limit was 55 miles an hour. Route No. 13 is commonly known as Military Highway. At the point in ques-

tion the highway consists of two northbound lanes and two southbound lanes which are separated by a center grass plot approximately 20 feet wide. There is an opening or "cut-off" which permits a motorist proceeding in a southerly direction to turn left across the northbound lanes into Greenbriar road. Both the northbound and southbound lanes are divided by broken white lines. Greenbriar road intersects the highway from the east at a right angle.

Plaintiff, a Roman Catholic priest, was operating his automobile in a northerly direction on Military Highway at a speed of approximately 50 miles an hour. Defendant Creekmore was driving a dump truck owned by defendant Beasley in a southerly direction on the other side of the center grass plot and intended to make a left turn across plaintiff's path of travel onto Greenbriar road.

When plaintiff reached a point about 1000 to 1500 feet from the intersection of Military Highway and Greenbriar road he passed a heavily loaded pickup truck which was traveling north in the right lane at a speed of about 45 miles an hour. He then continued to drive in the left lane which was next to the center grass plot. When he reached a point approximately 200 feet from the intersection he realized for the first time that defendant Creekmore was going to make a left turn. At that time Creekmore's truck was "right in the intersection, making the turn." Creekmore had not indicated that he was going to turn and "he never did stop." He drove through the opening or "cut-off" across the path of plaintiff's oncoming vehicle. Plaintiff applied his brakes, but his automobile skidded 78 feet and its entire front end struck the right front wheel and fender of Creekmore's truck. The impact occurred near the center of the northbound lanes, and plaintiff's car was a total loss. Shortly after the collision Creekmore was heard to say, "I did not see him, I did not see him."

Plaintiff testified:

"I came to pass the pick-up truck, which was going at a speed which at that moment was much below the allowed speed limit on the Military Highway, and it took me quite a time to pass, and since it was a 4-lane highway, I took my time to cut in rather than cut in right in front of the truck, and I was just going to engage in coming back to my right lane when I saw this truck [defendant Creekmore's] coming from, traveling south at a speed where I expected it would go straight.

"He was certainly not exceeding the speed limit, but he was traveling south at a speed where no one would expect him to turn off.

"He did slow down to a certain extent. He did not stop, and at the moment of impact, he must have been traveling about 10 or 15 miles an hour, and I applied the brakes, and since I had just started to come back to my right lane, the impact occurred about in the middle of the road, more to the right side of the lane, the far side of the lane."

Plaintiff was asked what, if anything, he did to avoid the collision. He replied:

"Well, as I said, as soon as it was clear to me that he wasn't going to stop, I applied the brakes, and insofar as was possible, I went to the right, having in mind not to endanger—all this was in the fraction of a second, but I was aware of the fact that there was traffic in the right lane behind me, and in order not to endanger the traffic behind me, I veered to the right as much as I possibly could.

"It was already too late at that moment to avoid the collision."

Plaintiff was rendered unconscious by the collision. He was taken by ambulance to the emergency room of Norfolk General Hospital where he was treated for laceration of the scalp, multiple abrasions about his face and extremities, fractured ribs, and two fractures of his right leg, one just below the knee joint and another just above the ankle joint. Plaintiff was examined by Dr. John A. Vann, an orthopedic surgeon, in the emergency room. Dr. Vann testified:

"The treatment at that time was limited because of his past medical history of having had a cardiac condition and his history of having lost consciousness at the accident.

"I then admitted him to Norfolk General Hospital where we continued to treat his leg by a means of what we call closed reduction, not operating on him because of his general condition, in which the fracture was placed in a cast and the cast was then cut and wedged in an effort to reduce the fracture."

Two days later plaintiff was transferred to DePaul Hospital "mainly for convenience reasons." Dr. Vann said that the "effort to align the fragments up by closed manipulation" was continued since an open reduction (operation) did not seem justifiable in view of plaintiff's head injuries and his "cardiac condition"; that because of plaintiff's general condition "we didn't feel like we should risk giving him general anesthesia," and that the closed reduction treatment caused plaintiff to suffer pain.

At the time of the trial plaintiff's fractures had healed, but the fracture above his ankle joint had healed "with a deformity." The "operating plane" of the joint was "tilted to an angle of 20 degrees"

thereby causing him a 15 to 20 per cent permanent disability. The record shows that in the future plaintiff will have "instability in walking; and in a period of time, he is going to develop changes in the ankle joint that are going to require further treatment." He will develop "traumatic arthritis" in the joint which will produce "more pain and stiffness" that can be relieved only by means of an operative procedure known as "ankle fusion." If the operation is not performed, plaintiff "will just be left with this partially stiff ankle, walking on an angle that is tilted and will just have to tolerate the pain." If the operation is performed, plaintiff's pain can be completely relieved, but he will be left with "a stiff ankle joint, which will interfere with his gait."

In their assignments of error, defendants contend that the trial court erred: (1) in refusing to hold plaintiff guilty of contributory negligence as a matter of law; and (2) in granting and refusing certain instructions.

Defendants argue that when plaintiff passed the pickup truck at a distance of 1000 to 1500 feet from the intersection and continued to drive in the left lane "practically" to the point of impact while the right lane was "completely unobstructed" he violated Code, § 46.1-203 which provides:

"Except as otherwise provided by law upon all highways of sufficient width the driver of a vehicle shall drive the same upon the right half of the highway, unless it is impracticable to travel on such side of the highway and except when overtaking and passing another vehicle, subject to the provisions applicable to overtaking and passing set forth in §§ 46.1-208, 46.1-210 and 46.1-212."

Defendants maintain that if plaintiff had been traveling in the right lane as required by the statute, he could easily have avoided the collision by pulling off the highway into a parking lot which adjoins the highway at the intersection. Thus, they say, his violation of the statute was negligence *per se*, and reasonable men could not differ that this negligence was a proximate cause of the accident. We find this contention to be without merit.

It appears from the record that the case was tried upon the theory that the statute was applicable. Instruction E,[1] offered by defendants,

[1] "The Court instructs the jury that if the highway is of a sufficient width, it is the duty of the driver of a motor vehicle to drive same upon the right half of the highway unless it is impracticable to do so, or unless such vehicle is in the act of overtaking and passing another vehicle. Therefore, if you believe from the evidence that the plaintiff in this case drove his vehicle on the left side of the highway immediately prior to and at the time of the accident when he was not in the act of over-

was granted. It was not objected to on the ground that the statute does not apply to a highway with two roadways divided by an unpaved area. Hence, we are not here concerned with that question. Rule 1:8 of Rules of Court. Plaintiff objected to the instruction on the grounds that it was not consistent with the facts; that it failed to point out that he had passed another vehicle "from 800 to 1,000 feet from the intersection" and that all of the evidence showed that had he turned into the right hand lane sooner he would have created a hazardous condition for himself and for the traffic on his right. No cross-error was assigned to the granting of the instruction.

Code, § 46.1-208, which is incorporated by reference into Code, § 46.1-203, *supra*, reads:

"The driver of any vehicle overtaking another vehicle proceeding in the same direction shall pass at least two feet to the left thereof and *shall not again drive to the right side of the highway until safely clear of such overtaken vehicle*, except as hereinafter provided." (Emphasis added.)

It is true that plaintiff's car passed the pickup truck at a distance of 1000 to 1500 feet from the intersection, but the truck was moving at a speed of about 45 miles an hour while plaintiff's vehicle was moving at a speed of approximately 50 miles an hour. Hence, it is readily apparent that plaintiff had to travel a considerable distance before he was sufficiently clear of the pickup truck so as to be able to safely return to the right lane. Plaintiff testified: "The fact I wasn't going too fast, I could not pull in as soon as I passed. I would have to have a certain margin of safety." He was in the act of returning to the right lane when the collision occurred.

It is well settled that negligence, contributory negligence and proximate cause are usually questions for the jury. It is only when reasonable men may draw but one conclusion from the facts that they become questions of law for the court to decide. *Greyhound Lines* v. *Brown*, 203 Va. 950, 952, 953, 128 S.E. 2d 267. It is equally well established that the violation of a statute constitutes negligence *per se*. *Smith* v. *New Dixie Lines*, 201 Va. 466, 470, 111 S.E. 2d 434.

Under the facts and circumstances of this case we cannot say as a matter of law that plaintiff violated § 46.1-203 and thus was negligent.

taking or passing another vehicle and when it was practical or possible for him to drive on the right side of the highway, then such act of driving on the left side of the highway was neglicence (sic); and if you further believe from the evidence that such driving on the left side of the highway was a proximate contributing cause of the accident, then the plaintiff cannot recover in this action and your verdict must be for the defendant."

The evidence presented a jury question. But assuming that plaintiff violated the section by not returning to the right lane before the collision, reasonable men could differ as to whether his actions constituted a proximate cause of the accident. That being the case, a jury question was presented on this issue. We find that the trial court was correct in refusing to hold plaintiff guilty of contributory negligence as a matter of law.

■ We turn now to a consideration of the instructions in question. Defendants contend that the court erred in granting Instruction No. 11 which embodied the tables of speed and stopping distances as set forth in Code, § 46.1-195. Defendants concede that the statute allows the court to take notice of the tables, but they argue that it does not permit the jury to do so. They say that the statute is in derogation of the common law; that it must be strictly construed; and that the inclusion of the tables in an instruction permits the jury to disregard the oral testimony of witnesses, to resort to the tables to resolve any conflict in the evidence, and to arrive at its verdict by arithmetical calculation based upon the tables. We are of opinion that these contentions are without substance.

Code, § 46.1-195 provides in part: "(a) *All courts* shall take notice of the following tables of speed and stopping distances of motor vehicles, *which shall not raise a presumption*, in actions in which inquiry thereon is pertinent to the issues: * * *." (Emphasis added.)

It has been held that in cases triable by a jury the word "court" employed in a statute includes the jury as a constituent part. See 10 Words and Phrases, Court-of Justice. We think it was the intendment of the General Assembly in enacting § 46.1-195 to include juries within the meaning of the word "courts" and to authorize that juries be instructed as to the contents of the statute which are pertinent to the issues in a particular case. See Virginia Jury Instruction, § 25.16, p. 179.

Here, we find no valid reason why plaintiff offered Instruction No. 11. All of the evidence adduced with respect to speed was that both drivers involved in the collision were operating their vehicles within the speed limit. There was no suggestion to the contrary. Even though the evidence did not require or justify the granting of the instruction, we hold that the granting of it was harmless error since neither plaintiff nor defendants were benefited or prejudiced thereby.

■ Defendants next assert that the court erred in granting Instruction No. 14 which provided in part:

"If from the evidence and the other instructions of the Court you find your verdict in favor of the plaintiff * * * then in assessing the damages to which he is entitled you may take into consideration any of the following which you believe from the evidence to have resulted from the collision:

*   *   *   *   *

"4. Any disfigurement or deformity resulting to him and any *humiliation or embarrassment* associated therewith;

*   *   *   *   *

"7. Any loss of earnings or *lessening of earning capacity* he may reasonably be expected to sustain in the future by reason of any injury sustained;" (Emphasis added.)

Defendants say that paragraph 4 was erroneous because it allowed plaintiff to recover for humiliation and embarrassment when there was no evidence of this item of damage. The record shows, however, that one of plaintiff's fractures has healed "with a deformity"; that for the rest of his life plaintiff "will walk with a gait"; that "[h]e can either take little short steps altogether, or take one and a half steps"; and that "every time he puts his foot down to take a step he has to guard against falling or stumbling, not knowing if he is going to turn his foot over or not, unless of course he has some external form of support." The jury could have properly concluded from this evidence that plaintiff's injuries are and will be a constant source of humiliation and embarrassment to him.

Defendants further contend that paragraph 7 of the instruction was erroneous because there was no evidence to support it. They argue that there was no showing by plaintiff that his future earning capacity has been lessened by reason of any injury he sustained. The evidence reveals that plaintiff will suffer future loss of earnings resulting from an operation which should be performed on his leg, but the record is devoid of any evidence showing that his future earning capacity has been lessened by virtue of the injuries he sustained. We, therefore, hold that the trial court erred by including in paragraph 7 the item of damage relating to "lessening of earning capacity."

Defendants also contend that the court below erred in granting Instruction No. 15, which read as follows:

"One who is liable for negligently inflicting personal injuries on another is responsible for all the ill effects which, considering the condition of health in which the plaintiff, Herman M. Bosscher-

muller, was when he received the injury, naturally and necessarily follow such injury. *A defendant's liability is in no way lessened or affected by reason of the fact that the injuries would not have resulted had the plaintiff been in good health,* or that they were aggravated and rendered more difficult to cure by reason of the fact that he was not in good health. And if the jury believe from the preponderance of the evidence that the plaintiff, Herman M. Bosschermuller, at the time of the accident, was not in good health or that he was suffering from a pre-existing disability, and that *this condition made any injuries he may have received in the accident more severe, or more aggravated, or more difficult to cure,* then, if he is entitled to recover in this action, *he may recover for such additional aggravation* and difficulty resulting from the accident, but not for any pre-existing disability." (Emphasis added.)

Defendants argue that the instruction was improper because it was in conflict with the evidence and not supported by it. They say that plaintiff was in good health prior to the accident and that he failed to show that his pre-existing heart condition was in any way affected by the accident or that it caused his injuries sustained in the accident to be more severe, aggravated, or difficult to cure. Plaintiff, on the other hand, says that he is not contending that his heart condition was aggravated by the injuries he received but rather that his condition did make his injuries more severe, or more aggravated, or more difficult to cure. He asserts that the instruction merely told the jury, in effect, that defendants took him as they found him.

The record discloses that there was sufficient evidence to support that part of the instruction which permitted the jury to find that plaintiff's pre-existing "cardiac condition" caused his injuries to be more difficult to cure. Dr. Vann's testimony showed that plaintiff's past history of heart trouble, at least in part, caused his immediate treatment to be limited and further caused his fractures to be reduced by "closed manipulation" instead of by the "open reduction" method. Also, because of plaintiff's "general condition" he could not be given general anesthesia while his leg was being set, and as a result his treatment was painful.

There is not a scintilla of evidence in the record, however, to indicate that plaintiff would not have suffered his broken ribs, fractured leg, or other injuries if he had not had a pre-existing "cardiac condition," i.e., if he had been in good health. Hence, the statement in the second sentence of the instruction that defendants' "liability is in no way lessened or affected by reason of the fact that the in-

juries would not have resulted had the plaintiff been in good health" was misleading and confusing to the jury. Moreover, there was no showing that any of his injuries sustained in the accident were aggravated or made more severe because of his pre-existing heart condition, yet the last sentence of the instruction permitted him to recover "for such additional aggravation."

Plaintiff argues that he suffered additional pain when his leg was set by means of the closed reduction method without anesthesia and that this pain constituted an aggravated injury which would not have occurred but for the existence of his pre-existing "cardiac condition." But plaintiff's Instruction No. 14 clearly distinguished between pain and injury and permitted the jury to award damages for each separately. Hence, plaintiff's contention that his additional pain constituted an aggravated injury is without merit.

Plaintiff was awarded a large verdict and we cannot say that the size of the verdict was not affected by the jury's speculation concerning items of damages contained in the instruction that were not supported by the evidence. Our conclusion is that on the record before us the trial court committed prejudicial error in granting Instruction No. 15.

Defendants assigned error to the granting and refusing of other instructions, but the alleged errors were not pressed or discussed in oral argument before us. It would unduly prolong this opinion and would serve no useful purpose to discuss them. Suffice it to say that the court did not err with respect to its rulings on these instructions.

Defendants' liability to plaintiff has been clearly established and proved under nonprejudicial instructions of the court relating thereto. In conformity with an alternate request of defendants the judgment appealed from is reversed and the case is remanded for a new trial on the issue of damages only.

*Reversed and remanded.*