**Susan M. POWER**

v.

**The ARLINGTON HOSPITAL.**

**Civ. A. No. 92–0005–A.**

United States District Court,
E.D. Virginia,
Alexandria Division.

Aug. 28, 1992.

Scott A. Mills, Falk & Causey, Washington, D.C., for plaintiff.

William Daniel Cremins, Walsh & Cremins, P.C., Kenneth Joseph Barton, Jr., Godard, West & Adelman, P.C., John Allen Blazer, Crews & Hancock, Fairfax, Va., Joseph Patrick McMenamin, McGuire, Woods, Battle & Boothe, Richmond, Va., Scott A. Mills, Falk & Causey, Washington, D.C., for defendants.

## MEMORANDUM OPINION

ELLIS, District Judge.

This federal "patient dumping" [1] action is brought pursuant to the Emergency Medical Treatment & Active Labor Act of 1986, 42 U.S.C. § 1395dd *et seq.* (1988), as amended ("EMTALA").[2] Two questions, both novel in this circuit, are presented by the parties' cross-motions in limine. They are:

(1) Are damages recoverable by a plaintiff in a federal "patient dumping" action against a participating hospital limited by Virginia's one million dollar medical malpractice damages cap, Va.Code § 8.01–581.15?

(2) Are damages recoverable by a plaintiff in a federal "patient dumping" action against a participating hospital limited by Virginia Code § 8.01–38, which limits the tort liability of insured charitable hospitals to the limits of its liability insurance?[3]

For the reasons that follow, the Court concludes that neither limitation applies to this unique private federal action.

---

1. "Patient dumping" is the hospital practice of transferring or refusing to treat patients who are indigent or uninsured. *See Urban v. King,* 783 F.Supp. 560, 562 (D.Kan.1992).

2. EMTALA was passed as part of the Consolidated Omnibus Budget Reconciliation Act of 1986 ("EMTALA"), Public L. No. 99–272, 100 Stat. 82.

3. The statute requires the policy limits of such insurance to be not less than $500,000 per occurrence. *See* Va.Code § 8.01–38.

*Facts*

At approximately 5:45 a.m. on February 24, 1990, plaintiff Susan Power was driven to Arlington Hospital's emergency room. When she arrived at the Hospital, Ms. Power, then a thirty-three year-old British subject living in the United States, was unable to walk and required a wheelchair and assistance to enter the emergency room. She complained of hip pain, chills, and inability to walk. It appears she also had a sizeable boil visible on her cheek, although an examining physician testified he did not see it and no mention of it is found in the medical records for that day. In the emergency room, Ms. Power's vital signs were taken and recorded, an x-ray of her hip was taken, a "dipstick" urinalysis test was performed, and a more thorough urinalysis study was ordered. The physician on duty examined her, rather cursorily she believes. This physician's shift ended at 7:00 a.m. His successor also examined her. Neither physician reached a definitive diagnosis. The records reflect that the second physician said he "did not know for sure" what was causing her hip pain and that her problem could be "musculoskeletal or possibly related to a neurogenic problem...." Despite this uncertainty, no blood studies or other tests were ordered. Instead, before the urinalysis test results became available, Ms. Power was given a prescription for a pain medication,[4] told to return if her condition worsened, and discharged from the emergency room. She left as she had arrived—by wheelchair. In all, Ms. Power's stay in the emergency room lasted no more than two hours. Early on in this period, shortly after her arrival at the emergency room, the Hospital learned that Ms. Power was uninsured and unemployed.

Ms. Power did as she was told. Her condition worsened so she returned to the emergency room the next day. This time she was immediately admitted. The differential diagnosis on admission was septic shock. So serious was her condition that she remained hospitalized for four months, during which she underwent the amputa-

tion of both legs below the knees and lost her sight in one eye.

At the end of the four month period, the Hospital transferred Ms. Power to Central Middlesex Hospital in Great Britain. Several issues concerning the transfer are material and apparently disputed. Thus, the parties dispute whether Ms. Power's condition was stabilized at the time of the transfer. Also disputed is whether Ms. Power consented to this transfer. And although unclear, it appears that Arlington Hospital sent Central Middlesex Hospital only five pages of Ms. Power's voluminous medical records. Finally, there appears to be a sharp dispute between the parties over whether Central Middlesex Hospital is an equivalent facility to Arlington Hospital. Ms. Power claims it is not and that she suffered additional harm as a result of the transfer.

On these facts, Ms. Power filed a four-count, 180 million dollar action against seven defendants. Count one alleged an EMTALA "patient dumping" action against the Hospital, a physician, and a physicians group based on the failure to provide an appropriate screening examination. *See* 42 U.S.C. § 1395dd. Count two alleged a state law cause of action for battery against the Hospital and a second physician based on the amputations. Count three alleged a second EMTALA action against the Hospital, yet another pair of physicians, and another physicians group, based in this instance on Ms. Power's transfer to the British hospital. Finally, Count four sought damages under state law for emotional distress from the Hospital, several physicians, and a group. Defendants filed threshold dismissal motions and following oral argument, the Court dismissed the physicians and their groups as defendants in the EMTALA actions because the Act authorizes actions only against "participating hospitals". *See* 42 U.S.C. § 1395dd. *See also Urban v. King,* 783 F.Supp. 560, 562 (D.Kan.1992). The Court also dismissed the state tort law causes of action

---

**4.** Ms. Powers apparently also received a supply of Naprosyn to be taken in case she had a

urinary tract infection.

without prejudice, *inter alia,* on the ground that such claims must be subjected to the Virginia Malpractice Act process before they may be asserted in court.[5] Following these rulings, the Hospital sought summary judgment on the remaining EMTALA claims, which the Court denied given the existence of disputed material facts.[6] Left for trial, therefore, are the two EMTALA "patient dumping" claims. But now before the Court to be resolved prior to trial are the parties' cross motions in limine concerning whether to limit damages to (i) the Virginia one million dollar medical malpractice cap or (ii) the Virginia tort liability limit for insured charitable hospitals. Each of these is separately considered.

## Analysis

### A. Medical Malpractice Cap[7]

Congress enacted the EMTALA prohibition against "patient dumping" to respond

---

5. See Va.Code §§ 8.01–581.1 *et seq.* (1992). *See also Glisson v. Loxley,* 366 S.E.2d 68, 72 (Va. 1988) (any tort based on health care, including a patient's battery claim against a health care provider, is subject to the medical malpractice review process); *Hagan v. Antonio,* 397 S.E.2d 810 (Va.1990) (same). These state tort claims were also dismissed *without prejudice pursuant to a* federal court's discretionary power to dismiss pendent claims. *See United Mine Workers v. Gibbs,* 383 U.S. 715, 86 S.Ct. 1130, 16 L.Ed.2d 218 (1966).

6. On summary judgment, the Hospital argued, *inter alia,* that Ms. Power's claims should be dismissed because they were in fact state medical malpractice claims masquerading as EMTALA "patient dumping" claims. It is true that the "patient dumping" provisions of EMTALA were not intended to supplant state malpractice remedies, nor were they intended to be the "Federal Medical Malpractice Act." *See Collins v. DePaul Hosp.,* 963 F.2d 303 (10th Cir.1992); *Cleland v. Bronson Health Care Group,* 917 F.2d 266 (6th Cir.1990); *Gatewood v. Washington Healthcare Corp.,* 933 F.2d 1037 (D.C.Cir.1991). But the Hospital's argument, while correct in general, was inapposite here because Ms. Power is not in fact claiming negligence on the part of the Hospital. Rather, she claims the Hospital violated various § 1395dd requirements including specifically the Hospital's duty (i) to "provide an appropriate medical screening examination within the capability of the hospital's emergency department to determine whether or not an emergency medical condition exists," § 1395dd(a); (ii) to provide "such treatment as may be required to stabilize the medical condition ... or to transfer the individual to another medical facility," § 1395dd(b)(1), except that transfer is prohibited unless the patient or lawful surrogate, fully informed of the risks of transfer, requests or consents to it or a physician certifies that medical benefits from transfer outweigh risks, § 1395dd(c)(1)(A)(i) & (ii); and (iii) in the event of a transfer to provide the receiving hospital with "all medical records." § 1395dd(c)(2)(A) & (C). The record bristles with factual disputes on these claims thereby foreclosing summary judgment. For example, with respect to the first duty, Ms. Power must show that the screening examination she received was not as thorough or careful as that which the Hospital would have offered to any other patient. *See Jones v. Wake County Hosp. Sys., Inc.,* 786 F.Supp. 538, 544 (E.D.N.C.1991). This claim may be made out, for example, through proof of differential treatment. But the claim may also be established through proof of a failure to adhere to the Hospital's standard protocols, or, absent such standard protocols, proof of a failure to meet the standard of care to which the Hospital adheres. In the latter instance, the line between malpractice and a violation of EMTALA blurs somewhat. Consider a situation in which a hospital adheres to a standard requiring tests A, B, and C as part of an appropriate emergency room medical screening. In many instances, this standard will also be the malpractice standard of care. Thus, failure to perform test C, for example, would violate both EMTALA and the standard of care applicable in a malpractice claim. But if tests A, B, and C are performed and the doctor evaluating the results draws an incorrect conclusion, a violation of EMTALA may not be established, but medical negligence may be. In short, the issue is not whether the Hospital's treatment was adequate as measured against a malpractice standard of care, *see Jones,* 786 F.Supp. at 544 ("A hospital that acts consistently with its customary screening procedure is not liable under Section 1395dd(a) even if that standard is inadequate under that state's malpractice law."); *Abercrombie v. Osteopathic Hosp. Founders Ass'n,* 950 F.2d 676 (10th Cir.1991) (sections of EMTALA providing for civil enforcement by an individual impose a strict liability, not a negligence, standard), but rather whether the claimant received the same screening examination regularly provided to other patients in similar circumstances. *See Jones,* 786 F.Supp. at 538. The parties' experts sharply dispute this issue. Also disputed is whether Ms. Power consented to the transfer and whether the transfer was appropriate under the statute.

7. Virginia Code § 8.01–581.15 provides, in pertinent part, as follows:

In any verdict returned against a health care provider in an action for malpractice where the act or acts of malpractice occurred on or after October 1, 1983, which is tried by a jury or in any judgment entered against a health care pro-

"to the nationwide problem of 'dumping' indigent patients who have no health insurance." *Stevison v. Enid Health Sys., Inc.,* 920 F.2d 710, 713 (10th Cir.1990). In essence, the EMTALA provisions obligate hospitals receiving medicare funds, like Arlington Hospital, to follow certain procedures when patients present themselves to an emergency room. More specifically, the provisions impose two principal obligations on covered hospitals. First, those hospitals "must provide for an appropriate medical screening" to determine whether a patient has an "emergency medical condition." [8] *See* 42 U.S.C. § 1395dd(a). Second, those hospitals cannot transfer [9] a patient with an emergency medical condition unless and until that condition has been "stabilized." *See* 42 U.S.C. § 1395dd(c).[10] Importantly, EMTALA provides for a private right of action to enforce these obligations:

> (A) Personal Harm. Any individual who suffers personal harm as a direct result of a participating hospital's violation of a requirement of this section may, in a civil action against the participating hospital, obtain those damages available for personal injury under the law of the state in which the hospital is located, and such other equitable relief as is appropriate.

42 U.S.C. § 1395dd(d)(3)(A). Thus, the question presented is whether the phrase "those damages available for personal injury under the law of the state" encompasses or excludes Virginia's medical malpractice damages cap. Since this is a question of statutory interpretation, it is fundamental that the "starting point in every case involving construction of a statute is the language itself." *Blue Chip Stamps v.*

*Manor Drug Stores,* 421 U.S. 723, 95 S.Ct. 1917, 44 L.Ed.2d 539 (1975).

The language of § 1395dd(d)(3)(A) is refreshingly clear and simple: the damages available for "patient dumping" actions are the state's personal injury damages. This plainly means that plaintiffs seeking recovery for "patient dumping" may recover under EMTALA for each of those elements of damage for which recovery is permitted under state law. In Virginia, these elements are well-defined. As reflected in Virginia's Model Jury Instructions, recoverable elements of damage for personal injury claims are:

> 1) any bodily injuries he sustained and their effect on his health according to their degree and probable duration;
>
> 2) any physical pain [and mental anguish] he suffered in the past [and any that he may be reasonably expected to suffer in the future];
>
> 3) any disfigurement or deformity and any associated humiliation of embarrassment;
>
> 4) any inconvenience caused in the past [and any that probably will be caused in the future];
>
> 5) any medical expenses incurred in the past [and any that may be reasonably expected to occur in the future];
>
> 6) any earnings he lost because he was unable to work at this calling;
>
> 7) any loss of earnings and lessening of earning capacity, or either, that he may reasonably be expected to sustain in the future;
>
> 8) any property damage he sustained.

VMJI, Inst. No. 9.000 (1988).[11] Significantly, Virginia law places no dollar limit on

---

vider in such an action which is tried without a jury, the total amount recoverable for any injury to, or death of, a patient shall not exceed one million dollars.

**8.** EMTALA's protection extends to any individual who seeks emergency room care. *See Brooker v. Desert Hosp. Corp.,* 947 F.2d 412, 415 (9th Cir.1991); *Gatewood,* 933 F.2d at 1040.

**9.** "Transfer" includes discharge. *See* 42 U.S.C. § 1395dd(e)(4).

**10.** An exception to this obligation exists where the patient or a legal surrogate, with full knowl-

edge of the attendant risks, requests a transfer. *See* 42 U.S.C. § 1395dd(c).

**11.** *See also Todt v. Shaw,* 223 Va. 123, 286 S.E.2d 211 (1982) (bodily injuries, loss of wages, and future discomfort and inconvenience); *MacDonald v. Firth,* 202 Va. 900, 121 S.E.2d 369 (1961) (inconvenience, loss of earnings, and lost earning capacity); *Beasley v. Bosschermuller,* 206 Va. 360, 143 S.E.2d 881 (1965) (bodily injuries and disfigurement); *Exxon Corp. v. Fulgham,* 224 Va. 235, 294 S.E.2d 894 (1982) (lessening of future earning capacity); and *Owen v. Dixon,* 162 Va. 601, 175 S.E. 41 (1934) (an injured person may recover in full from a wrong-

personal injury damages. Equally significant is the conspicuous absence from the EMTALA "patient dumping" provision of any limiting language. The provision merely refers to "damages available for personal injury;" it does not say "damages for personal injury except as may be limited in certain states by medical malpractice statutes." As one court observed with respect to "patient dumping" under EMTALA, "had Congress desired to enact a more restrictive statute, presumably it would have done so." *Jones v. Wake County Hosp. Sys., Inc.* 786 F.Supp. 538, 543 (E.D.N.C.1991). It follows, therefore, that recovery for EMTALA "patient dumping" violations in Virginia may include damages for any of the eight elements listed above and is not limited to any dollar amount.[12]

Further support for this conclusion may be found in a review of the statutory purposes underlying the EMTALA provisions and the Virginia malpractice cap.[13] They are different. EMTALA's legislative history is replete with references to the Act's compensatory and deterrent purposes. Thus, the "patient dumping" provisions seek to deter covered hospitals from engaging in the proscribed behavior and to compensate the victims of such behavior.[14] The purpose of Virginia's malpractice cap is altogether different. Its objective is not the deterrence of certain behavior or the compensation of victims.[15] Rather, the cap was enacted to combat medical malpractice insurance availability and affordability problems plaguing Virginia's health care providers, especially physicians. *See Journ. of the House of Del.,* March 13, 1976 at 1076. *See also* Note, 44 Wash. & Lee L.Rev. 1463 (1988). This sharp difference in statutory purposes militates firmly against engrafting Virginia's malpractice damages cap onto EMTALA, particularly where, as here, EMTALA's plain language does not invite it.

Pertinent authority is sparse. Two decisions reach the opposite result. Neither is controlling or persuasive. In *Reid v. Indianapolis Osteopathic Med. Hosp.,* 709

---

doer regardless of any compensation he may receive from a collateral source).

**12.** Presumably, however, such an award would still be subject to a remittitur under appropriate circumstances. *See Arnold v. Eastern Air Lines, Inc.,* 681 F.2d 186 (4th Cir.1982), *cert. denied,* 460 U.S. 1102, 103 S.Ct. 1801, 76 L.Ed.2d 366 (1983). *See generally* 6A Moore's Federal Practice ¶ 59.08(7).

**13.** Legislative purpose can be a reliable guide in construing and applying statutes. *See, e.g., Pepper Burns Insulation, Inc. v. Artco Corp.,* 970 F.2d 1340, 1992 WL 158227 (4th Cir. (N.C.) July 10, 1992) (using legislative purpose in analyzing the Miller Act); *Gilbert v. General Elec. Co.,* 519 F.2d 661 (4th Cir.1975), *rev'd on other grounds,* 429 U.S. 125, 97 S.Ct. 401, 50 L.Ed.2d 343 (1976) (looking to legislative purpose in construing the Civil Rights Act of 1964); *Northern Va. Regional Park Auth. v. United States Civil Service Comm'n,* 437 F.2d 1346 (4th Cir.), *cert. denied,* 403 U.S. 936, 91 S.Ct. 2254, 29 L.Ed.2d 717 (1971) (legislative purpose of Hatch Act).

**14.** *See, e.g.,* H.R.Rep. No. 241, 99th Cong., 1st Sess., pt. 1 at 28; S.Rep. 146, 99th Cong., 1st Sess. *passim* U.S.Code Cong. & Admin.News pp. 42, 606; Conf.Rep. No. 453, 99 Cong., 1st Sess. at 476; *see also* H.R.Rep. No. 531, 100th Cong., 2nd Sess. at 19 (hearings on impact of "patient dumping" in the United States).

**15.** It is true, however, that the Virginia malpractice scheme as a whole seeks to deter certain conduct and compensate certain victims. Significantly, the conduct and victims involved are quite different from the conduct and victims that are the focus of the EMTALA "patient dumping" provisions. The malpractice scheme seeks to deter negligent conduct by all health care providers, *i.e.,* conduct that fails to meet the relevant standard of care. It is a fault-based scheme. By contrast, EMTALA applies only to certain hospitals, not to all health care providers, and is not premised on negligence. Thus, the EMTALA and malpractice schemes are separate and distinct, each aimed at different conduct for different reasons. *See Stevison v. Enid Health Sys., Inc.,* 920 F.2d 710 (10th Cir.1990); *Thornton v. Southwest Detroit Hosp.,* 895 F.2d 1131, 1133 (6th Cir.1990); *Abercrombie v. Osteopathic Hosp. Founders Ass'n,* 950 F.2d 676 (10th Cir.1991); *Gatewood,* 933 F.2d 1037.

Worth noting is that Ms. Power is also pursuing a Virginia malpractice action. She has filed a notice of claim under Va.Code § 8.01–581.1 *et seq.,* naming Arlington Hospital and several physicians as the parties who allegedly provided her with negligent care. The parallel pursuit of "patient dumping" actions and malpractice actions is neither improper nor uncommon. It merely reflects that the actions are distinct. But courts might have to take care to avoid double recoveries in those circumstances where negligent care and acts amounting to "patient dumping" proximately causes the same injury.

F.Supp. 853 (S.D.Ind.1989), the court concluded that "Congress *apparently* wished to preserve through the incorporation clause of § 1395DD(D)(3)(A)" the state malpractice limitation on damages. *Id.* at 855 (emphasis added). Yet the court never adequately explains why this is apparent. It appears the court's reasoning was (i) that Congress, in § 1395dd(d)(3)(A), must have intended to incorporate state limitations on damages; (ii) that Congress was aware of malpractice caps; and (iii) that since there are no state limits on general personal injury damages, Congress must therefore have had the state malpractice damages caps in mind. This reasoning includes false premises and is a nonsequitur. Even assuming, *arguendo*, that the EMTALA language could be read to include limitations on general personal injury damages, there is no warrant in that language for extending this reading to malpractice damages caps. The statutory language refers only to "damages available for personal injury;" it does not say, as the *Reid* court would have it, "damages available for personal injury or malpractice claims." And there are, as other decisions acknowledge, sharp differences between a medical malpractice action and an EMTALA action. They are separate and distinct causes of action focused on different conduct and aimed at different goals, matters not adequately accounted for in *Reid.* Beyond this, *Reid* incorrectly assumes that states do not have limits on general personal injury damages. Some do.[16] Next, it is probably true that Congress knew of the existence of medical malpractice caps. But it does not follow simply from this that Congress intended to incorporate those caps into EMTALA. Indeed, the opposite inference is more plausible because it is more consistent with the statute's plain language and its purpose. And finally, it is worth noting that *Reid* found it plausible to incorporate into EMTALA the malpractice damages caps, but not the state requirement for panel review of a malpractice claim before suit can be brought. In the *Reid* court's view, the latter requirement is a procedural obstacle at odds with EMTALA's purpose and that had Congress intended such an incorporation, it would have chosen more precise language. This is quite right, but virtually the same can be said about the malpractice damages cap. Had it intended to incorporate such caps in EMTALA, Congress would surely have chosen more precise language. And while the malpractice damages cap is not procedural, it is arguably at odds with EMTALA's purposes, a subject not discussed in *Reid.* Consider for example what effect a medical malpractice cap of say $1,000 or even $10,000 would have on the achievement of EMTALA's goals.[17] In any event, the principal flaw in *Reid* is that it ignores (i) that the statutory phrase "damages available for personal injury" has a well-understood generic meaning that is different from "damages available for malpractice claims;" (ii) that state malpractice actions are separate and distinct from EMTALA actions, each focusing on different conduct and each seeking to achieve different goals; and (iii) that in light of (i) and (ii), there is no good reason to assume or conclude that Congress apparently intended to

---

**16.** These states are: Alaska, Alaska Stat § 09.17.- 010 (1986) (noneconomic damages for personal injury may not exceed $500,000.00); Colorado, 1991 Colo.Rev.Stat. § 13–21–102.5 (noneconomic damages for "any civil action" shall not exceed $500,000.00); Idaho, Idaho Code § 6–1603 (1991) (noneconomic damages for personal injury shall not exceed $400,000.00); Kansas, Kan.Stat.Ann. § 60–19a01.(b) (1990) (total amount of damages in any personal injury action shall not exceed the sum total of $250,- 000.00); Maryland, Md.Code Ann., Court and Judicial Proceedings Act. § 11–108 (1989 Repl. Vol.) (noneconomic damages in personal injury action limited to $350,000.00); New Mexico, N.M.Stat.Ann. § 41–5–6 (1978) (limitation of $500,000.00 per occurrence in any action); Oregon, Or.Rev.Stat. § 18.560(1) (1989) (damages arising out of bodily injury may not exceed $500,000.00); and Wyoming, Wyo.Stat. § 1–4– 101 (1977) (damages for personal injury limited to that recoverable under the wrongful death act).

**17.** If similarly low caps were placed on general personal injury damages, they would likely be preempted as they would stand as obstacles to the attainment of the goals and purposes of EMTALA. *See Louisiana Pub. Serv. Comm'n v. F.C.C.,* 476 U.S. 355, 368–69, 106 S.Ct. 1890, 1898–99, 90 L.Ed.2d 369 (1986).

engraft state malpractice damages caps onto EMTALA private actions. The second contrary decision case, *Lee v. Allegheny Reg. Hosp. Corp.*, 778 F.Supp. 900 (W.D.Va.1991), is also unpersuasive, as it merely follows *Reid* without supplying any additional reasoning.

Apart from *Reid* and *Lee*, there is analogous authority supportive of the result reached here. It is found in those decisions that decline to import into EMTALA the requirement that a claim be brought before a malpractice review panel before it is brought in court.[18] This requirement is typical of most state malpractice schemes. As Judge Cacheris put it, this is a "procedural obstacle" that would "seem to be directly at odds with the purpose, the structure and the language of [EMTALA]." *Toliver v. Culpeper Memorial Hosp.*, C.A. No. 90–0501–A, slip op. (E.D.Va. Aug. 30, 1991).[19] The same reasoning applies to the malpractice damages cap; it, too, is at odds with EMTALA's purpose, structure, and language. The Supreme Court of Virginia reached a similar result in *Smith v. Richmond Memorial Hosp.*, 243 Va. 445, 416 S.E.2d 689 (1992). There, Virginia's notice claim requirement, designed to trigger the panel review option,[20] was held inapplicable to an EMTALA claim. To hold otherwise, the court concluded, would frustrate the federal two-year period of limitations. The same potential exists with respect to damages caps. Such caps, depending on their level, may frustrate the EMTALA goals of deterring "patient dumping" and compensating victims.

### B. State Liability Limits for Charitable Hospitals

Virginia law limits the liability of certain charitable hospitals for "negligence or other tort." Specifically, Va.Code § 8.01–38 provides, in pertinent part, as follows:

... [a] hospital ... which is insured against liability for negligence or other tort in an amount not less than $500,000 for each occurrence shall not be liable for damage in excess of the limits of such insurance, or in actions for medical malpractice pursuant to Chapter 21.1 ..., the lesser of the limits of such insurance or $1 million.

The Hospital asserts it is covered by this provision and that because its insurance policy limits are $1 million per occurrence, its liability for negligence or other tort under Virginia law is limited to $1 million. From this, the Hospital leaps to the conclusion that its EMTALA liability for "patient dumping" is similarly limited to one million dollars. This leap of illogic does not reach from the premise to the conclusion. The Virginia statute is inapplicable here, as an EMTALA action for "patient dumping" is neither negligence, nor a tort action. Rather, it is a *sui generis* federal statutory action unrelated in any way to fault or negligence.

And beyond this, the Virginia statute's operation is barred by the preemption doctrine because it conflicts directly with the intent, scope, and application of EMTALA. Incorporated in EMTALA is the following preemption provision:

The provisions of this section do not preempt any State or local law requirement, except to the extent that the requirement directly conflicts with a requirement of this section.

42 U.S.C. 1395dd(f).

"The touchstone of the preemption analysis is congressional intent." *Richmond v. American Systems Corporation*, 792 F.Supp. 449, 456 (E.D.Va.1992). *See also Allis–Chalmers Corp. v. Lueck*, 471 U.S. 202, 208, 105 S.Ct. 1904, 1909–10, 85

---

**18.** Virginia law provides any party to a malpractice claim the option to have the claim submitted to a malpractice review panel before it can be brought in court. Va.Code § 8.01–581.2(A). Only if no party exercises this option can the claim be taken directly to court.

**19.** The inappropriateness of the medical malpractice review panel process to an EMTALA claim is underscored by the fact that such panels under Virginia law are directed to focus on whether the health care provider's conduct met the proper standard of care. *See* Va.Code § 8.01–581.7. This focus is irrelevant to an EMTALA cause of action.

**20.** Va.Code § 8.01–581.2.

L.Ed.2d 206 (1985) ("The question whether a certain state action is pre-empted by federal law is one of congressional intent."); *Shaw v. Delta Air Lines, Inc.,* 463 U.S. 85, 95, 103 S.Ct. 2890, 2898–99, 77 L.Ed.2d 490 (1983) (same). "To discern Congress' intent we examine the explicit statutory language and the structure and purpose of the statute." *Ingersoll–Rand Co. v. McClendon,* 498 U.S. 133, ——, 111 S.Ct. 478, 482, 112 L.Ed.2d 474 (1990). As the Supreme Court described in *Louisiana Pub. Serv. Comm'n v. F.C.C.,* 476 U.S. 355, 106 S.Ct. 1890, 90 L.Ed.2d 369 (1986):

> Pre-emption occurs when Congress in enacting a federal statute expresses a clear intent to pre-empt state law, when there is outright or actual conflict between federal and state law, where compliance with both federal and state law is in effect physically impossible, where there is implicit in federal law a barrier to state regulation, where Congress has legislated comprehensively, thus occupying an entire field of regulation and leaving no room for the States to supplement federal law, *or where the state law stands as an obstacle to the accomplishment and execution of the full objectives of Congress.*

476 U.S. at 368–69, 106 S.Ct. at 1898 (emphasis added).

Here, application of the Virginia statute would impede the accomplishment and execution of the purposes underlying EMTALA, namely deterring "patient dumping" and compensating those who are unlawfully "dumped." *See supra* note 14 and accompanying text. *See also* "Your Money or Your Life: Interpreting the Federal Act Against Patient Dumping," 24 Wake Forest L.Rev. 173, 225 (1989) (noting that state law rules regarding charitable immunities for hospitals are candidates for preemption under EMTALA). As noted above, low state caps on malpractice damages would likely frustrate the achievement of EMTALA's goals. *See supra* note 17 and accompanying text. A similar untenable result would flow from a charitable immunities statute with similarly low insurance requirements. Importing the limits of a charitable immunities statute into EMTA-

LA would, in essence, allow states to limit EMTALA recoveries to very low, or even negligible, levels, thus effectively undermining the purposes of the federal law. Moreover, to hold that Virginia's malpractice cap does not apply to this EMTALA action, but at the same time to conclude that the charitable immunities statute, which limits a hospital's financial exposure to an amount that may be even lower than the malpractice cap, may be applied to a nonsensical result.

### Conclusion

In sum, the Court holds that neither Virginia's medical malpractice cap, Va.Code § 8.01–581.15, nor Virginia's charitable immunities statute, Va.Code § 8.01–38, applies to limit the amount of damages available in this federal "patient dumping" action. For the reasons here stated, plaintiff's motion in limine must be granted and defendant's motion in limine to reduce the *ad damnum* must be denied.

An appropriate order has issued.